### Richmond

## SEA-LAND SERVICE, INC.

### v.

## NANCY O'NEAL

December 3, 1982.

Record No. 800856.

Present: All the Justices.

344

John M. Ryan (*Vandeventer, Black, Meredith & Martin*, on briefs), for appellant.

*William A. Young* (*John F. Fixey; Alexander N. Simon; Rixey and Heilig; Wallerstein, Goode & Dobbins*, on briefs), for appellee.

CARRICO, C.J., delivered the opinion of the Court.

In the court below, Nancy O'Neal (O'Neal) filed a motion for judgment seeking compensatory and punitive damages against Sea-Land Service, Inc. (Sea-Land), for its alleged breach of an employment contract and its alleged fraud in inducing O'Neal to resign from one position in return for a promise, never fulfilled, of employment in another. A jury awarded O'Neal $125,000 in compensatory damages but denied her any punitive award. Sea-Land has appealed.

The record shows that O'Neal was first employed by Sea-Land in 1970 as a teletype operator/messenger in its Portsmouth terminal. Through a series of promotions, she advanced to management level. At the time of the incidents in question, she occupied the position of sales representative in one of the company's divisions, earning in excess of $19,000 annually, with extensive fringe benefits. Her most recent performance appraisal was "excellent," and she intended to remain in Sea-Land's employ until retirement.[1]

In the performance appraisal form, a space was provided to indicate the "performance improvement plan" the "evaluator" and the employee agreed upon "for the next year." One of the suggestions listed in this space on O'Neal's appraisal form was that she "[a]ttend junior college - spring or summer 1978." It was O'Neal's desire to secure a college education that brought about the incidents in question.

Stated in the light most favorable to O'Neal, the evidence relating to these incidents shows that in late December, 1977, or the early part of January, 1978, O'Neal learned that her old job of teletype operator/messenger was or soon would be vacant. This position required less travel than the sales representative job, and she believed it would permit her to attend school at night while providing her with sufficient funds to support herself until a better-paying position at Sea-Land became available.[2] She discussed the possibility of a transfer with James Chang, her immediate supervisor, with Ruby Porter, under whom she would work if transferred, and with Louis Nappi, the terminal manager whose approval of the transfer was necessary.

---

[1] O'Neal was 39 years old at time of trial and would have been eligible to retire at age 55.

[2] The teletype operator/messenger job paid $168.68 per 35-hour week, with the opportunity for overtime pay.

Chang, Porter, and Nappi all approved the transfer. They told O'Neal, however, that she would have to resign from her position as sales representative before "they could officially say that [she] had the teletype and messenger job." Nappi expressly stated to O'Neal that she "could have the other job" if she "turned the letter [of resignation] in." Accordingly, on Friday, January 13, O'Neal signed and delivered to Chang a letter in which she resigned as sales representative and accepted the teletype position. At an operational sales meeting held in the office the same day and attended by O'Neal, Chang announced that she was leaving his division and Nappi stated that she "would be taking the teletype and the messenger's job."

When O'Neal reported for work Monday morning, Nappi informed her she "could not have the job" as teletype operator/messenger because she was "over qualified [and] all he needed was somebody with two legs and a driver's license." When she asked him why he was "doing this," he replied that he "didn't have time to be bothered with [her]."

O'Neal then telephoned Charles Hauser, Chang's superior in Jacksonville, Florida, and asked whether she could retract her letter of resignation. He agreed to look into the matter, but told her afterward that "it was too late" to retract the letter. Hauser did tell her "not to worry about it," for there were "a couple other positions that might be coming open," and he would be "getting back to [her]." No other offers of employment with Sea-Land developed, however, and O'Neal's last day of work was March 10, 1978, after she had spent eight weeks training her replacement. At the time of trial, she was employed as a "sales representative" in a furniture store, working on a "straight commission" basis.

On appeal, Sea-Land assigns ten separate errors and condenses them into these four questions, as quoted from its brief:

I. Whether Nancy O'Neal had an employment contract with the defendant and if she did what was the nature of the contract?

II. Whether the evidence was sufficient as a matter of law to permit Nancy O'Neal's claim of fraud and deceit to go to the jury?

III. Whether the matter of damages was properly submitted to the jury under either the contract or the fraud and deceit theories?

IV. Whether, if either . . . Nancy O'Neal's contract or tort claim is deficient, the rendering of a general verdict requires remand?

## I.

■ With respect to the contract question, Sea-Land first complains of the trial court's failure "to require Mrs. O'Neal to identify and describe the contract which she alleged was breached by [Sea-Land]." Sea-Land points out that, in her motion for judgment, O'Neal alleged the breach of a "contract of employment," and later, in response to an interrogatory seeking the terms of the contract, she identified two contracts of employment, "#1" being the contract covering her position as a sales representative, and "#2" the agreement under which she "was to be" a teletype operator/messenger. When Sea-Land moved to compel O'Neal to provide "more specific answers as to the contract," the court deferred the motion to the date of trial. Then, at trial, Sea-Land claims, the court not only failed to require O'Neal to identify further the contract she .relied upon but also permitted her to inject a third contract, *viz*, an "agreement to exchange one job for the other." This action of the court, Sea-Land maintains, was error.

We disagree with Sea-Land. It argued below that the contract O'Neal asserted at trial was not "the contract . . . sued on," that the "suit speaks in terms of a contract of employment," and that O'Neal had changed her position "to say it's a contract to exchange jobs." We fail to see, however, why a contract to exchange jobs should not be considered a contract of employment; indeed, we do not believe it can logically be considered otherwise.

■ Furthermore, O'Neal's identification at trial of a contract to exchange jobs did not constitute the allegation of a third contract or even of a new theory. In her answers to interrogatories, O'Neal stated that, under position "#2" she "was to be" a teletype operator/messenger, that this represented a "switch from management to [non-management] status," and that upon assuming her duties "under #2 [she] was to relinquish [her] position under #1." These statements were sufficient to apprise Sea-Land of O'Neal's theory of a contract based upon an exchange of positions.

■ But, Sea-Land argues, under all the alleged contracts, the "employments involved were terminable at the will of either plaintiff or defendant and thus were indefinite as to duration"; accordingly, "there was no contract whatsoever." O'Neal admitted at

trial, Sea-Land says, that there were "no 'terms' as to the duration of her contract" of employment, either as a sales representative or as a teletype operator/messenger, and that there was "no limitation on [Sea-Land's] right to terminate her employment."

In a case cited by Sea-Land, we recognized that, where no specific time is fixed for the duration of employment, it is presumed to be an employment terminable at will, providing a dismissed employee no basis for recovery of damages against his erstwhile employer. *Hoffman Company* v. *Pelouze*, 158 Va. 586, 164 S.E. 397 (1932). We said, however, that "this presumption . . . is rebuttable." *Id.* at 594, 164 S.E. at 399. We held that the presumption was rebutted in *Hoffman* by "the interpretation which the parties themselves placed upon the matter"; although the employer "undoubtedly had the right to terminate the contract at any time without more ado," it did not do so, but asked the employee by letter to submit his resignation and "threw out to him the gratuity of more than a month's salary as an inducement." This, we said, "does not import overmuch confidence in [the employer's] contention that the contract was of indefinite duration and so terminable at will." *Id.*

▇ Here, as in *Hoffman*, although Sea-Land may have had the right to terminate O'Neal's employment at will either while she was still a sales representative or in the event she became a teletype operator/messenger, the company did not dismiss her this way. Instead, it promised her that, if she resigned from the one position, she would be employed in the other. This was an undertaking separate and apart from any contract covering the particular position involved and was not subject to any presumption of terminability at will that might have applied to such a contract. Once O'Neal performed her part of the bargain by resigning from the first position, Sea-Land became obligated to perform on its part and breached that obligation to her damage when it refused to employ her in the teletype operator/messenger position.

▇ Sea-Land suggests, however, that this separate agreement was not supported by a valid consideration. Sea-Land cites *Tow* v. *Miners Memorial Hospital Association, Inc.*, 199 F. Supp. 926 (S.D. W. Va. 1961), *aff'd*, 305 F.2d 73 (4th Cir. 1962), a case interpreting West Virginia law, which Sea-Land says is "closely analogous to the present matter." In Sea-Land's words, *Tow* stands for the proposition that "the surrender by the employee of former employment as a necessary incident to the acceptance of

new employment is not such consideration as will make the contract of employment anything other than terminable at will." The court did say this was the law in West Virginia; however, it stated that "the rule in Virginia is to the contrary," 199 F. Supp. at 937, citing *Twohy* v. *Harris*, 194 Va. 69, 72 S.E.2d 329 (1952).

*Twohy* involved an employee who threatened to resign because of inadequate compensation. The employer promised to hold certain corporate stock for the benefit of the employee if he would agree to continue his employment. We held that the employer's promise concerning the stock was supported by consideration when the employee refrained from exercising his right to resign and continued to perform the services required of him. We quoted with approval the rule that:

> [W]here one makes a promise conditioned upon the doing of an act by another, and the latter does the act, the contract is not void for want of mutuality, and the promisor is liable . . . . [U]pon the performance of the condition by the promisee, the contract becomes clothed with a valid consideration which renders the promise obligatory.

194 Va. at 81, 72 S.E.2d at 336. We believe this rule is applicable to the present case and demonstrates that O'Neal's act of resigning furnished adequate consideration for Sea-Land's promise to employ her in the teletype operator/messenger position.

As a corollary to its contract argument, Sea-Land contends that the trial court erred in granting Instruction No. 4. This instruction permitted the jury to find a plaintiff's verdict if it believed O'Neal and Sea-Land entered into "an employment agreement whereby [she] was to resign as sales representative and be employed as teletype operator and messenger." Sea-Land objected to the instruction on the ground that it "assumes existence of a contract which has never been proven." Because, as we have demonstrated, O'Neal did prove the existence of the contract specified in Instruction No. 4, we hold that the granting of the instruction was not error.[3]

---

[3] Sea-Land originally assigned error to the refusal of its proffered Instruction No. A1, relating to the terminability at will of an employment contract of indefinite duration. Sea-Land did not argue the refusal on brief, however; hence, we will not consider the point.

## II.

Sea-Land contends that O'Neal failed, as a matter of law, to establish fraud by clear, cogent, and convincing evidence. Sea-Land points out that O'Neal alleged the fraud was intentional and with malice; intentional fraud "consists of deception, intentionally practiced, to induce another to part with property or to surrender some legal right, and which accomplishes the end designed." Further, Sea-Land maintains, an action of fraud cannot be based upon a statement or promise relating to future events. Yet, Sea-Land asserts, O'Neal failed to show any intentional act on its part, to establish that any of its representatives bore her any ill will, or to prove that anyone made her a promise based upon existing or past events.

A case called to our attention by Sea-Land provides a complete answer to this argument. Sea-Land cites *Lloyd* v. *Smith*, 150 Va. 132, 142 S.E. 363 (1928), for the proposition that "an action based upon fraud must aver the misrepresentation of present [or] pre-existing facts, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events." 150 Va. at 145, 142 S.E. at 365. We opined further that, "[w]ere the general rule otherwise, every breach of contract could be made the basis of an action in tort for fraud." *Id.* But, in the very next paragraph of the opinion, we said this:

There are, however, some real and apparent exceptions. The courts are not agreed as to all of these exceptions, but there is much authority to the effect that an action in tort for deceit and fraud may sometimes be predicated on promises which are made with a present intention not to perform them . . . . It has been stated that the gist of fraud in such case is not the breach of the agreement to perform, but the fraudulent intent.

*Id. See also Restatement (Second) of Torts* § 530 comment c (1977).

The evidence in this case clearly, cogently, and convincingly supports the conclusion that, when Nappi told O'Neal she "could have the [teletype operator/messenger] job" if she "turned [in] the letter [of resignation from the sales representative position]," he made this promise with the then present intention not to perform it. Hence, O'Neal proved her allegation of intentional fraud,

and it was not error for the trial court to submit the fraud question to the jury.

### III.

■ With respect to the damage issue, the trial court granted Instruction No. 8, which reads:

> The Court instructs the jury that if, from the evidence and the other instructions of the Court, you find your verdict in favor of the plaintiff for compensatory damages, then in assessing the damages to which she is entitled, you may take into consideration any of the following:
> 1. Any loss of severance pay and any loss of earnings in the past and any loss of earnings she may reasonably be expected to sustain in the future;
> 2. Any other financial losses directly related to the loss of a job with the defendant;
> 3. Any damage caused by embarrassment or humiliation resulting from the loss of employment;
> And from these as proven by the evidence, your verdict should be for such sum as will fully and fairly compensate the plaintiff for the damages sustained by her.

In the court below, Sea-Land confined its objections concerning this instruction to those portions permitting the jury to award damages for future loss of earnings and for embarrassment and humiliation. Consequently, we will confine our consideration to the same portions and the same objections.

Regarding future loss of earnings, Sea-Land argued below that Instruction No. 8 permitted the jury to speculate because there was no evidence of any future loss nor were there any facts upon which the jury could intelligently assess the loss. Particularizing, Sea-Land told the court there was no evidence "as to [O'Neal's] future working life" and no showing she would remain in Sea-Land's employ.

It is true that O'Neal did not introduce any specific evidence to establish the span of her "working life." She did tell the jury, however, that she was thirty-nine years old and that she intended to work until she was at least fifty-five. This testimony would have permitted the jury to make an informed and reasonable estimate of the duration of O'Neal's "working life."

O'Neal also testified that she intended to remain in Sea-Land's employ until she retired. Sea-Land argues, however, that, although the trial court failed to require O'Neal to specify what contract she relied upon and, further, even instructed the jury on a contract "never described," her employment was terminable at will under all the alleged agreements. Hence, Sea-Land says, there was nothing to support an award for future loss of earnings.

But, as we demonstrated in Part I, *supra*, the so-called "never described" contract was properly submitted to the jury. We noted further that this contract carried no presumption of terminability at will and that Sea-Land breached the contract when it refused to employ O'Neal in the teletype operator/messenger position.

Considering O'Neal's age, the past recognition of the quality of her work, and her intention to remain in Sea-Land's employ, we believe there was an adequate basis for the jury to determine a reasonable period during which O'Neal would have continued in Sea-Land's employ as a teletype operator/messenger, had she been given that position. Hence, she was entitled to have the jury consider whether she suffered damage for future loss of earnings on her breach of contract theory.

On her tort theory, however, O'Neal was entitled to have the jury consider damages resulting from future loss of earnings based upon her former position as a sales representative. After all, it was that position from which she resigned as a result of Sea-Land's trickery. Of course, she could not recover the same damages twice, once on a contract basis and once on a tort theory, but the jury was warned against this sort of duplication in an instruction granted at Sea-Land's request.[4]

Concerning the portion of Instruction No. 8 which permitted the jury to award "damage caused by embarrassment or humiliation resulting from the loss of employment," Sea-Land objected below on the ground there was no "physical harm sustained by [O'Neal]" and "no evidence concerning intent or ill will" on Sea-Land's part which would support such an award.[5] Citing D. Dobbs, *Handbook on the Law of Remedies* § 12.25 (1973), Sea-

---

[4] In Instruction No. G, also granted at Sea-Land's request, the trial court told the jury that the amounts O'Neal "could have earned, did earn and will in the future earn, by accepting other employment, must be deducted from such damages as the jury may award."

[5] Sea-Land did not object below, and does not contend here, that O'Neal failed to show she was embarrassed or humiliated by Sea-Land's conduct.

Land argues "[i]t is settled law that an employee cannot recover damages from an employer in a breach of contract for humiliation or injury to feelings." Then, citing *Bowles* v. *May*, 159 Va. 419, 166 S.E. 550 (1932), Sea-Land maintains there can be no recovery of damages for harm to feelings in the absence of physical injury or wanton or willful conduct.

Sea-Land's analysis of Dobbs' views is correct as far as it goes. What the author actually says is that, "absent some tort," damages for "humiliation or injury to feelings" are not recoverable in an action for breach of contract. D. Dobbs, *supra*, § 12.25, at 927.

Sea-Land does state correctly the general rule applicable to tort cases that, absent proof of physical injury or wanton or willful conduct, there can be no recovery of damages for mental anguish, emotional distress, or humiliation. As with most general rules, however, there are recognized exceptions.

We established in Part II, *supra*, that Sea-Land committed an intentional tort against O'Neal. Previously, in at least five classes of cases involving intentional torts, we have approved the recovery of damages for humiliation, embarrassment, and similar harm to feelings, although unaccompanied by actual physical injury, *where a cause of action existed independently of such harm*. The cases and the torts are:

> *Peshine* v. *Shepperson*, 58 Va. (17 Gratt.) 472, 486 (1867) (deliberate trespass); *Ches. & Pot. Tel. Co.* v. *Carless*, 127 Va. 5, 9, 102 S.E. 569, 570 (1920) (wrongful suspension of telephone service); *W. T. Grant Co.* v. *Owens*, 149 Va. 906, 925, 141 S.E. 860, 866 (1928) (false imprisonment); *James* v. *Powell*, 154 Va. 96, 117, 152 S.E. 539, 547 (1930) (libel); and *Spitzer* v. *Clatterbuck*, 202 Va. 1001, 1006-07, 121 S.E.2d 466, 469-70 (1961) (malicious prosecution).

By way of comparison, the potential for distress to O'Neal from the loss of her job through Sea-Land's trickery was not substantially less than the harm caused by the torts involved in the cases cited above. Similarly, the wrong committed by Sea-Land was not materially less egregious than the conduct of at least several of the defendants involved in the earlier decisions. In this case as well as each of those cited, harm to the feelings of the prospective victim was readily foreseeable. We perceive no logical reason,

therefore, to permit recovery of distress damages there and to deny similar damages here.

## IV.

 Finally, Sea-Land contends that, because the jury returned a general verdict, the judgment appealed from must be reversed and the case remanded "if this court determines that either the contract claim or fraud claim is deficient . . . ." Having determined that neither claim is deficient, and finding that Sea-Land has failed to demonstrate reversible error otherwise, we will affirm the judgment of the trial court.

*Affirmed.*