**Paul B. WOODRING, Plaintiff,**

v.

**BOARD OF GRAND TRUSTEES OF THE BENEVOLENT & PROTECTIVE ORDER OF ELKS, et al., Defendants.**

**Civ. A. No. 85–646(R).**

United States District Court,
W.D. Virginia,
Roanoke Division.

April 23, 1986.

Jay J. Levit, Levit & Mann, Richmond, Va., for plaintiff.

Clinton S. Morse, Woods, Rogers & Hazlegrove, Roanoke, Va., for defendants.

## MEMORANDUM OPINION

TURK, Chief Judge.

Plaintiff Paul B. Woodring seeks compensatory and punitive damages from the Board of Grand Trustees of the Benevolent & Protective Order of Elks (the "Board"), and from the following Trustees of the Elks, both individually and in their capacities as Trustees: Gerald L. Powell, Vern R. Huck, Ted Callicott, Bob J. Bybee, Al F. Humphrey, Peter T. Affatato, Lester C. Hess, Jr., and James W. Damon. Woodring has claimed that the defendants fraudulently induced him to enter an employment contract, breached his employment contract, and intentionally inflicted emotional distress upon him. The defendants have moved for summary judgment. For the reasons set forth below, the motion will be granted.

## BACKGROUND

The facts of this somewhat unusual case are completely recorded and virtually undisputed. However, events leading to the incident in controversy began to unfold at the turn of the century. The Benevolent and Protective Order of the Elks ("Order") is a nonprofit organization well known for its fraternal, charitable, and community endeavors. The Board is the body charged with the management of the Order's affairs, including the Elks National Home (the "Home").

The Home was founded in 1903 on the outskirts of Bedford, Virginia. As reflected in excerpts from the annually published "Proceedings of the Grand Lodge Benevolent and Protective Order of Elks" (hereinafter "Annual Proceedings") and the "Grand Lodge Annual Reports," the Home has served as "a home away from home" where senior members of the Order could retire to live and other members of the Order (as well as the public) might visit.

As the Annual Proceedings further reflect, the successive Executive Directors of the Home over the years have all been married and, with the assistance of their wives, sought to create a truly "home like," rather than institutional, atmosphere at the Home. Hence, by custom and practice, the Executive Director and his wife have functioned as a husband and wife team. The Order has taken justifiable pride in and have annually acknowledged the accomplishments of both in their keeping of the Home.

In May 1982, the Board began to make plans to hire an Assistant Executive Director for the Home in order to provide an orderly transition of responsibility in the Executive Director's post. Doral E. Irvin, who had been Executive Director of the Home since January 1, 1965, would reach the age of seventy-two in August 1985, and it had been agreed that he would retire as Executive Director on September 1, 1985. At the July 17, 1982 meeting, the Board officially voted to advertise in various publications for the position of Assistant Executive Director.

Woodring was one of the persons who ultimately applied for the position. At that time he was employed as a Project Engineer in the Transportation Department at Pennsylvania State University at a salary of $18,500.00 per year. Woodring first learned of the opening for the Assistant Executive Director position when Powell, a member of the Board, mentioned the position to him during the Elks National Convention in July 1982. Powell was the founder of the Elks National "Hoop Shoot" program, and plaintiff at the time was serving as Assistant to the National Director of Hoop Shoot. In the course of working together, they had become close friends. Woodring had initially declined interest in the Assistant's position, but Powell suggested that he visit the Home in September 1982. Following a September visit, plaintiff decided to apply.

At the time he applied, Woodring had been an Elk for some twenty-one years and

was aware of the custom and practice that existed at the Home that the Executive Director position involved a husband and wife team. In the resume that plaintiff submitted as a part of his application, he included a one-page dissertation concerning his wife's prior involvement in various Elk's programs. Woodring did so because he was told to "put something in there about his wife." He readily acknowledged that with respect to all the other jobs for which he had previously applied, nobody had ever asked him to put down extensive information about his wife.

Woodring requested several people to write letters of reference for him in support of his application. Emile Brady, who was the Director of the Elks National Hoop Shoot program and also a close friend of plaintiff, was one of those who wrote a supporting letter of reference. In his letter, after favorably commenting upon Woodring, Brady concluded as follows:

> He and his wife, Janice, radiate a warm and cordial atmosphere at all the social functions my wife and I have had the privilege to attend, both in Elkdom and his chosen profession at Penn State. Realizing full well the importance his wife must play in the capacity he is applying for, I can only say that to meet and know her will describe it all. She is charming, intelligent, warm and loyal. Her profession as a registered nurse has lent a great deal to their family and community.

In due course, Woodring was selected as a finalist for the position and was notified that both he and his wife were to visit the Home on Saturday, November 20th to be given a tour of the facility and be interviewed by Board members. Plaintiff recognizes that in prior job interviews, he had never had to bring his wife with him.

Prior to interviewing the finalists for the position, the Board prepared a written list of twenty-six questions to be asked each couple who were to be interviewed togeth-er. Twenty of these questions were directed at the husband and six at the wife. Question 26, which was asked of each wife, read as follows:

> What do you think about your husband accepting this position which will require so much of your time and talents to assist him?

Throughout the interview process Woodring never specifically asked whether marriage was a job requirement, nor did defendants ever expressly tell him that. In plaintiff's own words, there was no need for defendants to make such statement.

Following Woodring's selection, then Board Chairman Traynor, Callicott, and Powell, along with Advisory Committee [1] member H. Foster Sears, again met with plaintiff to negotiate an employment agreement to be submitted to the Board for approval. There was considerable negotiation concerning salary since the Board was offering a starting salary of $20,000, and Woodring was unwilling to accept it. Ultimately, a compromise was reached wherein he accepted the starting salary of $20,000, and the Board members agreed to raise his salary $2,500 after the first six months and an additional $1,500 at the end of his first year of employment, which would bring his salary to $24,000 after one full year of employment.

Woodring asserts that, contemporaneously with the above contract negotiations, Powell told him in a conversation between the two of them that upon Irvin's retirement as Executive Director of the Home on September 1, 1985, plaintiff would be made the new Executive Director. Plaintiff, himself, has no basis for believing that when Powell made this statement to him he did not genuinely believe what Powell was saying, and defendants' own records further reflect that it was certainly anticipated that Woodring would become the new Executive Director upon Irvin's retirement. Indeed, defendants acknowledge that the whole point of hiring him was to provide for an

---

1. The Advisory Committee of the Grand Lodge is a committee of past leaders of the Order who serve in an advisory capacity to the Board.

orderly transition when the existing Executive Director retired. At the February 21, 1983 Board meeting, the full Board approved Woodring's employment agreement.

On March 15th, Powell forwarded a transmittal letter and copy of the employment agreement to Woodring for his signature. The termination provisions of the contract read as follows:

TERMINATION OF AGREEMENT

A. Probationary Period.

Employment under this agreement is subject to a probationary period of six months, during which time the Board, acting through its Executive Director, may terminate the agreement without notice and without cause. At the expiration of six months, this employment contract and the Operations Assistant's performance hereunder will be reviewed by the Executive Director, and by the Board. Thereafter, this agreement may be terminated by the Board only after notice as set forth hereinafter.

B. Termination After Probationary Period.

It is agreed by the parties hereto that the Operations Assistant is employed for such time as the Board is in need of and desirous of his services and that the duration of employment is unspecified and solely rests in the discretion of the Board.

This employment agreement may be terminated after the probationary period by either party at any time on sixty days' written notice to the other party. The Board specifically reserves the right to remove the Operations Assistant at any time without notice, but in such case, the Board shall be required to pay all basic salary and allowances for a full sixty day period thereafter.

Upon receiving the contract, plaintiff called Powell to talk with him about the accommodation allowance provision of the contract and to further discuss with him the termination provisions of the contract. As Woodring stated in his deposition:

Q. Did you have any other discussions with him before you signed it?

A. Yes. I discussed with him the sections under Termination.

Q. All right. What were the nature of those discussions, please, sir?

A. I did not like the way all these things were worded, that they could just dump me.

Q. It was clear to you as written that they could just dump you?

A. It was clear to me that I could start September first and October first, I could be gone. This is what was clear to me.

Q. Well did you have any discussions with Mr. Powell about that?

A. I certainly did.

Q. What did you tell him and what did he respond?

A. I told him I didn't like that section. I didn't like having that hanging over my head, that I could, you know, give up my job up here, go down there, and it would be gone. And even after the probation period was over, they put it in there that they are kind of leaving the door open, that if something comes along that doesn't suit them, that I will be gone. And his response to that, as to the other part too, because the man was a very dear friend, he said, Don't worry about it. Don't worry about it. That was all; that was all of his response. So as a friend, I didn't worry about it.

Q. All right. Was there anything else said in relation to this termination provision or did that pretty much conclude your discussion with him?

A. Those were the big items under Termination, and A and B sections and the part about the accommodation allowance. That was basically all we really discussed at that point.

\* \* \* \* \* \*

Q. All right. I take it that what you have related to me just now were the sum and substance of all of the discussions you had with Mr. Powell before you signed the Contract.

A. Concerning the contract, yes.

When asked what he thought what Powell meant by his statement not to worry about

it, Woodring replied, "I have known the man for ten years; and ... when he said 'Don't worry about it,' you just didn't worry about it," or in other words that he was "good to his word."

Powell similarly recalls that Woodring telephoned him after receiving the final draft of the contract to talk with him about the accommodation allowance and to express concerns about the termination provisions. Powell similarly regarded plaintiff as a close personal friend, had been an influential supporter of his for the position, and otherwise had an extremely high regard for him. He maintains that he sought to reassure Woodring that he would do fine in his new position.

After concluding his discussions with Powell, Woodring signed the contract. As the terms of the contract reflect, Woodring did not actually commence his duties as Assistant Executive Director until September 1, 1983. Soon after coming to work, he filled out an employment application for his file. The application reminded him that "I understand and agree that my employment is for no definite period and may, regardless of the date of payment of my wages and salary, be terminated at any time."

Woodring had been at work scarcely a month when problems arose between him and Irvin because plaintiff began to make decisions affecting the Home without checking with or obtaining the approval of Irvin. After a meeting with Powell, Callicott and Irvin, Woodring authored a memo concerning his feelings toward Irvin. The memo to Powell commences as follows:

Needless to say I am now, and was Tuesday afternoon, extremely upset with the situation that was called to my attention during the meeting with you and Ted, and when we got together with Doral. I can assure you, only with the utmost in self control was I prevented from climbing over that desk and throwing his overbearing ass through the picture window.

The entire one and one-half page memo continues in the same vein. Despite the foregoing, the parties maintained matters on an even keel. Then, on January 11, 1984, Woodring's wife suddenly and unexpectedly passed away from a brain hemorrhage.

After a special telephone conference on January 31, 1984, the Board of Trustees voted to offer Woodring a six-month extension of the initial probationary period under his contract and a corresponding postponement of his work evaluation that would be due at the end of February. Defendants felt that because of the tragic circumstances such discussions should be deferred to a later date. In due course, a proposed amendment to plaintiff's employment contract was prepared, and Irvin was charged with presenting it to him with the explanation that if plaintiff rejected the amendment, defendants would adhere to the initial employment agreement calling for a performance evaluation in February. Woodring admits that he has no knowledge that there was any ulterior motive in offering him the extension or that there was anything wrong with defendants' offering such extension, nor does he believe that defendants were in any way out to "get rid of him" at the time. Woodring, however, declined the extension.

After Woodring refused the extension of his initial probationary period and requested that he be evaluated in February 1984 as originally contemplated, Irvin prepared a three page typed evaluation of plaintiff. The evaluation reflected favorably upon him in every respect, and Irvin submitted it to the Board.

At the February 21, 1984 meeting of the Board, the Board reviewed Woodring's high evaluation and "all agreed that he should not be terminated because he does not presently have a wife." Concern was expressed by some Board members, however, about what effect the death of Woodring's wife would have on his continued employment. Ultimately, the Board directed Callicott to relate the Board's views and evaluation of his work to plaintiff. Thereafter, Callicott and Irvin met with Woodring to advise him of his favorable performance review and to caution him that there might be some question

relating to his future employment because his wife had passed away.

After receiving his evaluation, plaintiff advised Callicott that he had fully recovered from his traumatic events and had a different perspective and outlook on life. In addition, he requested that the Board inform him as to whether he was required to have a wife in order to fill the position of Assistant Executive Director for Operations. Woodring further explained to Callicott that he thought he would remarry, but he couldn't speculate as to when that might occur, that he could still return to a position of employment at Penn State and that he would accept the decision of the Board without malice or ill feeling toward anyone.

At its next meeting commencing May 7, 1984, the Board reviewed Callicott's report. In addition, the Board received the views of Robert Yothers, Chairman of the Advisory Committee, that the various members thereof (who had also reviewed Callicott's report) had reached the conclusion that the positions of Director and Assistant Director both required a husband and wife team. Board minutes further reflect that after discussion among Board members:

> The consensus was that the Board respected the views of Brother Yothers and members of the Executive Committee of the Advisory Committee, that Brother Woodring had had a lovely wife when he was hired, that the evaluation of the performance of his duties has been excellent and that terminating his position at this time because he had sustained the loss of his wife would not be proper. It was further agreed that the Executive Director of the Home must have a wife and, that a wife is essential in the exercise of an Executive Director's duties. It was noted that Brother Woodring had requested the Board to advise him whether it was necessary for him to have a wife in order to be Executive Director. It was further noted that Executive Director Irvin was firm in his intention to retire effective September 1, 1985.

The Board thereupon invited Brother Woodring to join the Board for a discussion. The Board's views and concerns were made known to Brother Woodring. Brother Woodring stated he understood the necessity for the Executive Director of the Home to have a wife. He added that he believed he could return to his former job in Pennsylvania if he did so within a reasonable time. He stated he still desired to become the Executive Director of the Home, but that he would inform the Board at its October, 1984, meeting as to whether he would be getting married and that if prospects for a marriage did not exist at that time, he would resign in order that the Board would have sufficient time to select a replacement and train him prior to Brother Irvin's anticipated retirement in September, 1985.

Woodring recalled telling the Board only that he understood that the Board felt that the job of Executive Director required a wife.

During the May 8th meeting, Woodring also questioned whether he was receiving appropriate training from Irvin. Accordingly, Callicott was requested to investigate the matter and prepare a report. Callicott submitted his report on May 18, 1984, concluding that the plaintiff was being properly trained. The report further reflected that on May 11th he had met with Woodring and informed him of the Board's decision that the Executive Director must have a wife, and that plaintiff had informed him that he would advise the Board of his decision at the Board's October meeting.

Thereafter plaintiff became involved in controversy. Prior to the July meeting of the Board, Callicott submitted an extensive report summarizing what he viewed as Woodring's "apparent arrogant and egotistical and demanding attitude" which had surfaced and resurfaced during his employment. The Board further heard reports concerning poor work relationships between Woodring and Irvin, possible resignation of top staff if plaintiff were made Executive Director, apprehension among

Bedford community leaders concerning plaintiff, and what some felt to be an improper personal relationship which had developed between Woodring and Joyce Hubbard, Director of Housekeeping at the Home. After extensive and generally fruitless debate the Board adjourned on July 15th without taking any formal action.

While Powell and other members of the Board were trying to determine a proper course to resolve the matters, Chairman Yothers of the Advisory Committee stated that he felt that the Board could not afford to delay any longer in replacing Woodring since under the circumstances he simply could not meet the job requirement that he be married. Powell responded that the Board was mindful of the matter and was "trying to resolve same with sound logic and decency." There followed an exchange of correspondence between various members of the Board and Yothers which made it quite clear that the Advisory Committee was firm in its view (i) that the Executive Director must be married since the Executive Director and his wife must function as a husband and wife team, (ii) that all recent applicants for the position had been interviewed and judged on that basis and (iii) that it would be neither workable nor fair to continue Woodring's employment under the circumstances.

Ultimately, the Board decided to deal with the issue at its October meeting as originally planned. Some time in August or September, however, plaintiff received advance word from Powell that he would have to be married to continue his employment past the October Board meeting, and that he ought to consider resigning. Just before the Board meeting in October, Powell advised Woodring that the Board was going to vote to terminate his employment.

Prior to taking a final vote on the matter, the Board met with Woodring. Although fully advised that he was about to be terminated, plaintiff made no claim that his termination would be in breach of his contract, fraudulent, or in any other way wrongful. Instead, he advised them that nothing had happened in his personal life,

and that he still felt he was qualified and could still do the job.

After hearing from the plaintiff and reassuring him that they felt he had done a good job, the Board members nonetheless voted unanimously to terminate Woodring's employment. At Woodring's request and to assist him in his efforts to find another job, defendants furnished him a letter stating the basis of his termination, i.e., that because of his wife's passing, he could not meet job requirements. The letter also thanked Woodring for his cooperation and services during his employment and offered to furnish plaintiff letters of recommendation. The Board also provided that Woodring be afforded the use of his office for an additional thirty days to prepare resumes, etc., that his severance pay include payment of salary through October 17, 1984, two weeks vacation pay and an additional sixty days' pay as provided under the contract, and that his rent and automobile expenses would be paid.

Immediately upon conclusion of the Board meeting, Powell personally delivered the plaintiff's letter of termination to him. Woodring describes what occurred as follows:

A. Mr. Powell came to me after the meeting with a letter. . . . And Mr. Powell was extremely upset at that point.

Q. How could you tell that?

A. Hey, the man cried, that's how I could tell it. He was my friend and he still is.

\* \* \* \* \* \*

Q. What did he say to you when he handed you the document?

A. He just said, I am sorry. There was no need for discussion. He handed me the thing. The man is 80 years old; he broke down and cried.

Q. And so what did you say?

A. I said, I'm sorry, too.

Powell then invited Woodring to the cocktail party customarily held at the conclusion of a Board meeting. During this occasion all Board members visited with the plaintiff. All concerned expressed their re-

grets and engaged in other affable discussions.

The following day, Woodring invited Bybee and Huck to play golf and picked up their cart and green fees at the Bedford Country Club. Upon the departure of Board members later that day from the Home, plaintiff engaged in normal amenities with all of them. As he later recounted, "at that time there were no hard feelings."

Woodring also returned to the Home for the annual Christmas lighting ceremony in December 1984, and he and his then fiancee were invited to join Board members and others in the customary reception held at the Home. During this occasion he exchanged pleasantries with Board members who were present including Callicott, Powell, and Humphrey. Moreover, Woodring and his then fiancee, Gay Agee, looked at a number of diamonds which the plaintiff had asked Humphrey, who is in the jewelry business, to bring with him to the Home that evening. Finally, he sent all the defendants a Christmas card in December 1984 to express what Woodring describes was a genuine Christmas greeting.

In the meantime, defendants made no effort to oppose Woodring's claim for unemployment compensation which he drew from January through May, 1985. Doral Irvin was also supportive of plaintiff's subsequent application for employment with Allen Morrison, Inc., in Lynchburg, Virginia. Woodring was employed by Allen Morrison, Inc. in May 1985 and currently holds the position of Manager of Operations. He is engaged to be married, describes his current employment relationship as "stable," and prefers it to returning to Penn State.

Woodring filed the instant action on July 25, 1985.

## ANALYSIS

The defendants seek summary judgment on all three counts of Woodring's complaint. To simplify the analysis, the counts will be addressed in turn.

## A. FRAUDULENT INDUCEMENT

The Virginia Supreme Court has recently set forth the elements of actual fraud in *Winn v. Aleda Construction Co.*, 227 Va. 304, 315 S.E.2d 193 (1984). They are "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party mislead, and (6) resulting damage to the party mislead." *Winn*, 227 Va. at 308, 315 S.E.2d 193. *Winn* also reiterated that "the burden is upon the party charging fraud to prove it by clear and convincing evidence." *Winn*, 227 Va. at 308, 315 S.E.2d 193. Woodring raises claims of two types of fraud in his complaint.

Woodring first alleges fraud based on misrepresentations. Specifically, Woodring claims that Powell's statements to plaintiff (i) that he should not worry about it when Woodring expressed his concerns about the termination provisions of the contract, and (ii) that he would be made Executive Director upon the retirement of the existing Executive Director on September 1, 1985, fraudulently induced him to sign the employment contract. The court will consider these allegations *seriatim*.

It is settled law in Virginia that in order to amount to fraud, misrepresentations must not be vague and inconclusive. Moreover, a fraud action cannot ordinarily be predicated on mere expression of opinion, unfulfilled promises or statements as to future events. *Colonial Ford Truck Sales v. Schneider*, 228 Va. 671, 676, 325 S.E.2d 91, 94 (1985). Only if the expression of opinion, unfulfilled promise or statement regarding future events is made with an intent to deceive or mislead is it actionable as fraud. *Id.; Sea-Land Service, Inc. v. O'Neal*, 224 Va. 343, 351, 297 S.E.2d 647, 651–52 (1982).

■ Woodring's claim that Powell's statement "not to worry about it" amounted to fraud must be rejected. In the first place, it is not clear that the statement amounted to a fraudulent representation. The statement is inherently vague, and could not justifiably be relied on by Woodr-

ing to have meant anything. Moreover, the record is devoid of any indication that the statement was made with the intent to deceive. The statement cannot be construed to suggest that the contract's at-will termination provision meant something other than it said. Assuming facts most favorable to Woodring, the statement might be construed to suggest that Woodring need not fear termination, regardless of what the contract stated. Construed in the manner, however, the court notes that the statement would not be fraudulent. It was plainly the Board's intention at the time of these discussions to make Woodring the next Executive Director of the Home.

■ Woodring's claim that Powell's statement that Woodring would be made Executive Director of the Home amounted to fraud must also be rejected. As the *Sea-Land* court made clear, fraud claims regarding unfulfilled promises may only succeed if there is evidence that the promises were made "with a present intent not to perform them." *Sea-Land*, 224 Va. at 351, 297 S.E.2d 647. In the instant case, it is undisputed that the Board fully intended to make Woodring the next Executive Director of the Home.

■ Having thus disposed of Woodring's allegations of fraud based on misrepresentation, the court turns to Woodring's claim of fraud based upon concealment of facts. Woodring alleges the defendants defrauded him by failing to advise him prior to his employment that marriage was a requirement for the Executive Director's job and that he could be terminated if his wife died. The defendants acknowledge that under Virginia law, "concealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud." *Allen Realty Corp. v. Holbert*, 227 Va. 441, 449, 318 S.E.2d 592, 597 (1984).

The court is convinced that Woodring cannot prevail on this claim. Even if one assumes facts most favorable to Woodring and believes that at the time Woodring was hired, defendants had a formal policy requiring the Executive Director to be mar-

ried, Woodring cannot prevail. The defendants made no effort to conceal the fact that the Executive Director needed a wife. Woodring's wife was interviewed at the same time he was, and at least one letter of recommendation written on his behalf testified favorably of his wife's suitability for the job. Woodring plainly knew at the time of his interviews of the custom and practice that the Executive Director and his wife functioned as a team.

In addition, Woodring was married at the time. The parties simply failed to consider the possibility that Woodring's wife would predecease him. The record is barren of any evidence which would suggest that the defendants willfully and knowingly concealed any job requirement from him, or that they intended to mislead him. For all of these reasons, the defendants' motion for summary judgment on this final fraud claim must be granted.

## B. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In order to establish a claim of intentional infliction of emotional distress, the Virginia Supreme Court has stated that a plaintiff must prove: (1) the defendants' conduct was intentional or reckless; (2) the defendants' conduct was extreme and outrageous; (3) the defendants' wrongful conduct caused emotional distress; and (4) the emotional distress was severe. *Womack v. Eldridge*, 215 Va. 338, 342, 210 S.E.2d 145 (1974). It is for this court to determine whether the defendants' conduct may reasonably be regarded as so extreme and outrageous that the issue should be submitted to a jury. *Womack*, 215 Va. at 342, 210 S.E.2d 145.

Giving plaintiff's complaint a liberal reading, it alleges the intentional of reckless infliction of emotional distress in a number of instances. First, the complaint appears to allege that the same acts that give rise to Woodring's fraud claims state a claim under *Womack*. Second, the complaint alleges that the defendants pressured Woodring and attempted to coerce

him to remarry following his wife's death. Finally, the complaint alleges that the defendants intentionally inflicted emotional distress on Woodring when they terminated him.

■ Upon examination of the record in this case, the court is convinced that summary judgment is appropriately granted the defendants on these claims. Considering first Woodring's allegation that the facts underlying his fraud claims support a claim under *Womack,* the court believes this claim groundless. The defendants' conduct could hardly be considered extreme or outrageous.

■ The court will next consider Woodring's claim that the defendants pressured him to remarry shortly after his wife's death. The court need not consider whether such allegations would give rise to a claim under *Womack,* for the record refutes these allegations. Contrary to Woodring's assertion, the defendants proceeded very carefully following his wife's death. The defendants were at all times considerate of the delicacy of the situation, and tried to resolve the problem in an equitable and gentle manner.

■ The court will finally consider Woodring's claim that the defendants intentionally inflicted emotional distress on him by terminating him. Contrary to plaintiff's assertion that the defendants proceeded maliciously, the record clearly demonstrates that the defendants proceeded carefully and considerately regarding the termination. The defendants' activities simply cannot be characterized as extreme or outrageous. Moreover, Woodring's post-termination behavior betrays his claim that he suffered severe emotional distress. Going to the cocktail party, playing golf, and visiting at Christmas with the defendants are behavior inconsistent with such a claim.

### BREACH OF CONTRACT

Woodring also seeks damages for breach of his employment contract. Defendants contend, however, that the contract was terminable at will, and that Woodring is thus unable to recover on this claim. For the reasons set forth below, summary judgment will be granted for the defendants on this claim.

■ The court agrees with the defendants that the employment contract entered into by Woodring was one terminable at will. Section 4B of the employment agreement is virtually identical to model terminable-at-will employment provisions and provisions determined by courts to establish a contract terminable at will. *See, e.g., American Jurisprudence,* Legal Forms p. 729 (2d ed. 1972); *Cardinal Stone Co. v. Rival Manufacturing Co.,* 669 F.2d 395, 396 (6th Cir.1982); *Jay-el Beverages v. Miller Brewing,* 461 F.2d 658, 659 (3d Cir. 1972); *Parks v. Baldwin Piano & Organ Co.,* 386 F.2d 828, 829 (2d Cir.1967); *Crain v. Burroughs Corp.,* 560 F.Supp. 849, 852 (C.D.Cal.1983) (employment contract); *Harrison v. Fred S. James, P.A., Inc.,* 558 F.Supp. 438, 442 (E.D.Pa.1983) (employment contract).

Nevertheless, Woodring argues that the contract is ambiguous and supports his claim that the contract was terminable for cause. He points to language in Section 4A of the employment agreement, regarding termination of the contract during the probationary period, as support for his argument that the agreement can be read to permit termination only for cause following the probationary period. The court, however, is unpersuaded by Woodring's argument. The language of Section 4B is as clear as can be that the contract was terminable at will, and Section 4A does nothing to contradict or muddy that provision.

■ In a further attempt to demonstrate that the contract was ambiguous and not terminable at will, Woodring points to Section 5 of the employment agreement. That provision read as follows:

The position of Assistant Executive Director for Operations will be eliminated on September 1, 1985, and upon the retirement of the present Executive Di-

rector and upon appointment of a successor as Executive Director.

Woodring would have the court read this provision as making his contract with the Board one for a definite duration, i.e., until September 1, 1985. The court does not believe, however, that this provision can sustain Woodring's position. The most that can be said for Section 5 is that it sets forth the potential length of Woodring's employment as Assistant Executive Director. Section 5 in no way conflicts with the Section 4 termination rights of the Board under the employment agreement.

Faced with the fact that the contract as written undeniably authorized defendants to terminate the employment relationship at will, Woodring resorts to parol evidence to support his claim that the contract was terminable only for cause. Woodring notes that prior to his signing the agreement, Powell told him not to worry about the termination provisions. Based on this statement, Woodring argues that the agreement was terminable only for cause.

Defendants contend that this statement is without any legal significance because Powell lacked the authority to bind the Board. The court need not reach this issue, however, for even assuming Powell had the authority to bind the Board, such evidence is barred by operation of the parol evidence rule. As the Virginia Supreme Court has recently reaffirmed, "[t]he parol evidence rule is a time honored fixture in the laws" of Virginia. *Amos v. Coffey*, 228 Va. 88, 91, 320 S.E.2d 335, 337 (1984). Nor does the partial integration doctrine, an exception to the parole evidence rule, save Woodring in this case. The partial integration doctrine is available only to supplement a written agreement, and not to contradict or vary its written terms. *See Renner Plumbing v. Renner*, 225 Va. 508, 515–16, 303 S.E.2d 894 (1983).

Having failed to convince the court that the written employment agreement means something other than what it says, Woodring next contends that the contract was modified by the parties by subsequent oral agreement. In support of this conten-tion, Woodring does not point to any discussions or oral agreement. Instead, Woodring contends that the fact that the defendants told the Virginia Employment Commission that plaintiff had been terminated because he was unable to meet the requirements of his job indicates that the parties agreed that Woodring's employment could be terminated only for cause.

Plaintiff's argument here is spurious. His proffered evidence does not in any way support his contention that the contract was orally modified. In fact, there is absolutely no evidence in the record to support such a claim. Accordingly, the court concludes that Woodring is unable to support his claim that the contract was terminable only for cause.

Having failed to demonstrate to the court that he was terminable only for cause, Woodring next asserts that even if he was an at-will employee, his termination was wrongful. Woodring argues that it was a violation of public policy to require him to be married in order to hold the Executive Director's job. In support of his contention, Woodring points to *Bowman v. State Bank of Keysville*, 229 Va. 534, 331 S.E.2d 797 (1985).

In *Bowman*, the Virginia Supreme Court reaffirmed that Virginia adheres to the traditional view of employment at will. The court recognized, however, that at least twenty states have adopted a rule prohibiting employers from discharging at-will employees for reasons that violate "an established public policy." *Bowman*, 229 Va. at 539, 331 S.E.2d at 801. The court then adopted this rule itself, emphasizing that it is "a narrow exception to the employment-at-will rule," and holding that the discharges at issue were unlawful because they violated the established public policy of the Commonwealth as set forth in a Virginia statute. *Id.* at 539, 331 S.E.2d at 801.

Applying *Bowman* to the instant case, the court notes that no Virginia statute has been called to the court's attention which prohibits employers from requiring mar-

riage as a condition of employment. Woodring would assert that established public policies need not be found solely in Virginia statutes.

The *Bowman* court did not state whether its holding applies only to public policies that are embodied in statutes of the Commonwealth. On the facts of this case, however, this court need not determine whether the Virginia Supreme Court would recognize a public policy that was not expressly stated in a statute.

Even if there were a public policy prohibiting consideration of an employee's marital status in employment decisions, this policy cannot be said to be one of universal application. While there are many instances in which consideration of an employee's marital status might be inappropriate (e.g., cashier at a grocery store), there are a number of instances where consideration of marital status might be appropriate. In these latter instances, marital status is considered a highly relevant, job-related criterion for employment. Examples of these instances might include the presidency of a college and the pastorate of a church. These instances are so well-accepted in American tradition that it would be impossible to say that consideration of marital status in these contexts violates public policy.

In the present case, the Home had a long tradition of being run by a husband-wife team, even if the husband was the sole employee of the Order. The facts demonstrate that marital status was considered a highly relevant, job-related criterion for employment. Under these circumstances, Woodring's termination cannot be said to violate any public policy prohibition against consideration of marital status in employment decisions that the Virginia Supreme Court might otherwise recognize. For this reason, the court concludes that Woodring's termination did not run afoul of the teaching of *Bowman*.

## CONCLUSION

For the reasons set forth above, the defendants' motion for summary judgment will be granted.