## CIRCUIT COURT OF FAIRFAX COUNTY

Virginia Johnson

v.

Capital Area Permanente Group et al.

October 12, 1993

Case No. (Law) 113046

BY JUDGE THOMAS A. FORTKORT

This case is before the Court on defendants' motion to set aside the verdict and enter judgment for the defendants or in the alternative for a new trial. The Court heard oral argument on the motion and took the case under advisement. For the reasons set forth below, the motion is denied.

The facts underlying this case were debated over the course of a three-day jury trial which resulted in a verdict for the plaintiff, Virginia Johnson. Ms. Johnson was diagnosed with AIDS by Kaiser Permanente in January of 1989 when she was fifty-one years old. This diagnosis, and its effect on Ms. Johnson's life, are the basis of this litigation.

Ms. Johnson first was tested for AIDS in February of 1988, and the results were negative. In December of 1988, she was tested again by Kaiser Permanente, at her request, as part of a complete physical examination. The AIDS test used was the ELISA test, and the results were "weakly reactive." This test was followed up with a Western Blot test performed by American Medical Laboratory ("AML") which reported an "indeterminate" result.

Approximately a month later, the tests were retaken by Dr. Corinaldi of Kaiser Permanente. Again, the ELISA test was weakly reactive. The Western Blot, however, was positive, and Ms. Johnson was diagnosed with AIDS. In January of 1991, based on the results of ongoing T-cell testing, Kaiser Permanente prescribed AZT for Ms. Johnson and began treating her with the drug. Shortly thereafter, Ms. Johnson advised Dr. Corinaldi that she was unable to afford continuing AZT treatment, and Dr. Corinaldi referred her to the National Institute of Health (NIH). At that time, NIH was conducting a study of AIDS patients; AZT was provided to participants in the study at no charge. NIH conducted a series of screening tests on plaintiff, including among others the Western Blot and ELISA tests. Based on their findings, NIH concluded that Ms. Johnson did not in fact have AIDS and so notified her.

Ms. Johnson filed a medical malpractice suit against Kaiser Permanente and AML. The case was tried before a jury which returned a verdict in favor of the plaintiff and fixed her damages at $950,000. Defendants now ask that that verdict be set aside and judgment entered in their favor. In the alternative, defendants ask for a new trial. In their brief and in oral argument, defendants have offered six reasons to support their position. Defendants argue that the plaintiff failed to establish a cause of action under Virginia law because she "failed to plead and prove by clear and convincing evidence that she suffered a physical injury as a natural result [of] her emotional distress." Defendants' Memorandum in Support at 1. Defendants also challenge the testimony of Michael A. Ross, M.D., plaintiff's expert on the standard of care. According to the defendants, Dr. Ross failed to meet the standards for an expert witness set out in § 8.01-581.20 of the Virginia Code. In addition, defendants contend that plaintiff did not prove her *prima facie* case because Dr. Ross "failed to connect the alleged breach in the standard of care as the proximate cause of an injury." Defendant's Memorandum in Support at 1. The jury's verdict is challenged as unsupported, the Court's admission of the NIH testing results is challenged as hearsay, and the trial as a whole characterized as unfair due to the "statements and misstatements of plaintiff's counsel." Defendants' Memorandum in Support at 2. Each contention is discussed below.

## Qualification of Dr. Ross

The qualification of expert witnesses is governed by Virginia Code § 8.01–581.20. That section provides that in medical malpractice actions:

> The standard of care by which the acts or omissions are to be judged shall be that degree of skill and diligence practiced by a reasonably prudent practitioner in the field of practice . . . . Any physician who is licensed to practice in Virginia shall be presumed to know the statewide standard of care in the specialty or field . . . in which he is qualified and certified . . . A witness shall be qualified to testify as an expert on the standard of care if he demonstrates expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards and if he has had active clinical practice in either the defendant's specialty or a related field of medicine within one year of the date of the alleged act or omission forming the basis of the action. Va. Code Ann. § 8.01–581.20 (1992 Repl. Vol.).

This statute is designed in part to ensure that the expert testifying is subject to the same standard of care generally recognized by other practitioners in the field. The statute also prevents an expert, such as a specialist in a given area, from imposing his or her own standards of care upon persons with less specialized or different experience.

Defendants point out that the actions at issue in this case are those of Dr. Greg Corinaldi, who practices in the field of internal medicine. Dr. Ross, the plaintiff's expert, is a board certified obstetrician and gynecologist. The defendants claim that Dr. Ross not only "fail[ed] to demonstrate expert knowledge of the standards of Dr. Corinaldi's specialty," but indeed "testified that he had no idea what the standards were for internal medicine." Defendants' Memorandum in Support at 13. Defendants emphasize Dr. Ross's testimony during *voir dire*, in which he admitted that he was uncertain as to the identity and area of practice of the doctor who diagnosed Ms. Johnson. In the words of the defendants, "Dr. Ross made it abundantly obvious that he did not know who the person was that committed the alleged breach of the standard of care — let alone the practice or specialty involved." Defendants' Memorandum in Support at 14. This uncertainty on Dr. Ross's part,

however, does not render him unfit to testify in the instant case as to the standard applicable to a doctor diagnosing AIDS.

Certain physical disorders cross the lines of various disciplines within the medical profession. For instance, a patient with a back problem might be treated by practitioners in a number of fields: chiropractic, internal medicine, neurology, neurosurgery or orthopedic surgery. In such a case, each individual practitioner might be subject to a different standard of care based on the treatment prescribed and the practice in their field. Other disorders, however, are so prevalent that any doctor in active practice can properly diagnose the ailment, if not necessarily treat it. Pneumonia is one such ailment; AIDS, unfortunately, is another. Indeed, Dr. Martha Kendall, the defendants' own expert, testified during *voir dire* that "[v]irtually any physician can test for HIV." Transcript Dr. Kendall at 266. Earlier in *voir dire*, Dr. Kendall was questioned as follows:

Q. Is it your understanding that the interpretation of data with respect to HIV is exclusively limited to internal medicine practice?

A. No, by no means is it exclusively limited to [sic].

Q. Is it also something that every OB-GYN should have knowledge of?

A. Certainly OB-GYN physicians would be likely to test for HIV disease. Whether they then go on and follow HIV patients for that disease would be a matter of whether they are an expert in that case or well versed in that case or not.

As Dr. Kendall explained, AIDS is diagnosed by physicians in a wide variety of practice areas. In this case, where it is diagnosis that is at issue, the standard of care to which Dr. Ross testified is applicable to doctors across disciplines insofar as they test patients for the AIDS virus. Just as the testing procedure crosses disciplinary lines, so too must the standard of care. Thus, when the issue is AIDS screening, the scope of the "related field of medicine" is broad. As required by § 8.01–581.20, Dr. Ross demonstrated "expert knowledge of the standards of the defendant's specialty and of what conduct conforms or fails to conform to those standards" for the purposes of AIDS diagnosis. The testimony of both Dr. Ross and Dr. Kendall demonstrated that Dr. Ross's experience with AIDS screening is sufficient to satisfy the clinical practice requirement of the statute.

## Physical Injury

Defendants argue that Ms. Johnson "cannot recover damages . . . for negligently inflicted emotional distress" because "she has failed to plead or to present any evidence of a contemporaneous physical injury." Defendant's Memorandum in Support at 2. Defendants also contend that Ms. Johnson failed to establish damages for intentional infliction of emotional distress. Defendants' Memorandum in Support at 6. Defendants' argument presumes that their characterization of the instant suit as one for negligent or intentional infliction of emotional distress is valid. However, such a characterization is inaccurate. This is an action for medical malpractice and must be analyzed accordingly.

Defendants state that "[n]o new or separate cause of action exists for emotional distress purely in a medical malpractice case." Defendants' Response to Plaintiff's Memorandum at 1. This is true. The issue at hand, however, is "injury" in the context of medical malpractice, which was addressed by the Virginia Supreme Court as recently as April of this year. The case decided by the Supreme Court, *Howard v. The Alexandria Hospital*, 245 Va. 346, 429 S.E.2d 22 (1993), is factually parallel to the instant case. In *Howard*, the plaintiff was admitted to the defendant hospital for carpal tunnel surgery. *Id.* Due to negligence on the part of the hospital staff, the surgery was performed with unsterile instruments, and Ms. Howard required a series of treatments designed to combat infection. *Id.* Some of these treatments were invasive, and many produced severe side effects. *Id.*

The *Howard* court drew on previous Virginia case law in defining injury as "positive, physical or mental hurt to the claimant." *Id.* (Citations omitted). The physical component of Ms. Howard's injury included invasive medical procedures, as well as "headache, nausea, vomiting, fever, chills and unusual sweating." *Id.* In addition, the plaintiff "sustained . . . mental anguish and emotional distress in the form of fear for her own well-being and worry about possible contamination of friends and family." *Id.* In the instant case, the physical harm to the plaintiff is similar to that in *Howard*; the mental injury is identical.

In addition, since in this case there is a cause of action for medical malpractice independent of any infliction of emotional distress, mental anguish would be an element of the injury even without actual physical harm. *Cf. Sea-Land Service, Inc. v. O'Neal*, 224 Va. 343, 297 S.E.2d 647 (1982). This requirement of an independent cause of action as a

prerequisite to recovery for mental anguish mitigates the policy concerns cited by defendants. Defendants' Memorandum in Support at 7–9. Specifically, defendants note that "the trial court must tightly control torts based upon emotional distress" because such claims are easily feigned and difficult to verify. *Id.* at 7. It is true that there is a greater element of uncertainty in cases based solely on infliction of emotional distress because the damages themselves are the essential element of the tort. That risk is obviously lessened in cases involving claims other than infliction of emotional distress because the plaintiff must establish the elements of his or her cause of action before damages are even considered. In the case at bar, plaintiff was first required to prove to the satisfaction of the jury that a breach of medical standards occurred. She then had to establish that her injury, in both its mental and physical manifestations, was the result of that breach.

### Proximate Cause and the Prima Facie Case

Defendants now believe and allege that Ms. Johnson is "asymptomatic HIV-positive" and therefore suffered no damage as a result of Dr. Corinaldi's conduct. Defendants' Memorandum in Support 26–29. They contend that Ms. Johnson failed to carry her burden of proof because she "did not establish at trial that she is not HIV-positive." Although plaintiff submitted documentation from NIH, defendants claim "there was no foundation testimony to establish the reliability of the NIH results or to explain how and why they differed from the AML results." Defendants' Memorandum in Support at 26.

Defendants' current position on Ms. Johnson's HIV status is completely contrary to that which they assumed during discovery. Defendants' discovery response on this issue expressly stated that they "do not contend that the plaintiff is HIV positive." Plaintiff's Exhibit 18. At trial, and again in oral argument on this motion, defendants belatedly attempted to amplify this response. According to defendants, their response left open the issue of plaintiff's health status and required her to prove she is HIV-negative. They claim that she failed to do so. However, evidence was presented at trial from which a jury could (and did) conclude that plaintiff was misdiagnosed. Both NIH records and testimony by Dr. Ross were offered as evidence that Ms. Johnson does not have AIDS. In addition, the defendants are bound by their discovery response, which did not put Ms. Johnson's current health at issue. Counsel has attempted to recast this response, suggesting at oral argu-

ment that the statement meant only that defendants did not know Ms. Johnson's health and were making no representations as to it. Such an interpretation is not only disingenuous, but futile. The wording of the statement was unequivocal. Counsel said they "do not contend" Ms. Johnson is HIV-positive; now they seek to make exactly that contention. Counsel for the defendants raised the issue of Ms. Johnson's health in his closing argument to the jury. Nonetheless they returned a verdict for the plaintiff.

In short, the defendants should have realized their discovery responses precluded them from raising this issue. However, any argument on the discovery response is moot, since defendants' theory apparently was rejected by the jury, which did receive evidence sufficient to support such rejection.

### Verdict

According to the defendants, the plaintiff "failed to present sufficient evidence to support a finding that there was a breach of the standard of care." Defendants' Memorandum in support at 17–18. Defendants point out that Dr. Ross's testimony as to the recording of Ms. Johnson's history differed markedly from that of Dr. Corinaldi and contend that the plaintiff could not recall sufficient detail to rebut Dr. Corinaldi's version of events. On the issue of appropriate retesting, defendant argues that Dr. Ross's testimony was contradicted by four other doctors. *Id.* at 25. All of these arguments address the credibility of the witness, which is determined by the jury. They do not provide a basis to disturb the verdict.

### NIH Records

At trial the plaintiff introduced into evidence documents from NIH containing the results of her tests. Defendants object to this evidence as hearsay. Without citing any authority, defendants contend that the NIH documents were inadmissible because plaintiff did not provide "any witness connected with those documents to testify as to the truth and veracity of them to establish the criteria by which their tests had been performed and to explain the results of those tests and why there was a discrepancy between the tests performed at NIH and the test results of the American Medical Laboratories." Defendants' Memorandum in Support at 29.

Defendants' argument is not persuasive. In the first place, the NIH records were certified pursuant to federal law. Plaintiff's Memorandum in Opposition at 40. Defendants fail to explain why the plaintiff is required to resolve the discrepancy between the AML and NIH tests, if indeed any such discrepancy exists. There was evidence that even the AML test results, when properly interpreted, did not support a conclusive diagnosis of AIDS. The Court also notes for the second time that the defendants' discovery responses indicated that they did not dispute characterization of plaintiff as HIV negative.

### Fair Trial

The Court has reviewed the trial transcript and memoranda filed by counsel and finds no evidence to support defendants' characterization of the trial as unfair. Plaintiff's closing argument, to which defendants failed to object at trial, was adequately supported by the evidence. Finally, contrary to the assertions of the defendant, the jury's award of damages does not "shock the conscience" such that it should be set aside.

The defendants' motion to set aside the verdict or grant a new trial is denied.