PENNSYLVANIA LIFE INSURANCE
COMPANY, Plaintiff and
Counter-Defendant,

v.

Gladys E. BUMBREY, Emma L. Henderson, Harmon F. Johnson, Nathaniel J. Radford, Jr., Ossie L. Skipper, Defendants and Counter-Plaintiffs.

Civ. A. Nos. 87–0023–A, 87–0407–A.

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 3, 1987.

James L. Nolan, Washington, D.C., Rodney H. Glover, Alexandria, Va., for plaintiff and counter-defendant.

William Denton, Biloxi, Miss., James R. Becker, Middleburg, Va., for defendants and counter-plaintiffs.

## MEMORANDUM OPINION

CACHERIS, District Judge.

Plaintiff/counter-defendant Pennsylvania Life Insurance Company ("Penn Life") brings this Motion for Summary Judgment against defendants/counter-plaintiffs Gladys E. Bumbrey ("Bumbrey"), Emma L. Henderson ("Henderson"), Harmon F. Johnson ("Johnson"), Nathaniel J. Radford, Jr. ("Radford"), and Ossie L. Skipper ("Skipper"). For the reasons set forth below, the motion is granted in part and denied in part.

## I. BACKGROUND

This case involves, as the caption suggests, insurance policies issued by Penn Life to five residents of Virginia, the defendants/counter-plaintiffs in this action. Each of these individuals was insured under a Penn Life Automobile Accident & Hospital Insurance Policy which provided for monthly benefits in the event of an accident causing total disability resulting in house confinement. Each counter-plaintiff suffered an accident and made a claim for benefits. As to each claim, a dispute arose regarding whether the claimant was house confined and therefore entitled to benefits. Each claimant subsequently signed a release settling his or her claim. On January 7, 1987, Penn Life began this case by filing a Declaratory Judgment action seeking an order declaring the releases valid and enforceable.

The defendants (also collectively referred to as the "counter-plaintiffs") deny the validity of the releases on grounds of fraud and in their Second Amended Counterclaims seek damages from Penn Life for breach of contract, fraud in the inducement (insurance policies), and fraud in the inducement (releases). In addition, defendant Radford claims he signed the release under duress. All counter-plaintiffs except Johnson also claim damages for intentional infliction of emotional distress.

Penn Life argues in its Motion for Summary Judgment that the releases executed by the counter-plaintiffs are valid and enforceable as Penn Life did not misrepresent facts, but merely stated opinions. Penn Life also asserts that each of the fraud counterclaims is barred by the statute of limitations. As to the breach of contract claims, Penn Life argues (in addition to the validity of the releases) that the house confinement clause found in each of the insurance policies is valid and enforceable, and therefore all benefits contractually due the counter-plaintiffs were paid. Finally, as to the claims for intentional infliction of emotional distress, Penn Life argues its conduct was not sufficiently extreme and outrageous to create liability for emotional distress.

## II. SUMMARY JUDGMENT

In general, summary judgment " 'should be granted only where it is perfectly clear that no issue of fact is involved and inquiry into the facts is not desirable to clarify the application of the law.' " *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979) (*quoting Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950)). The burden is on the moving party to " 'show' that there 'is no genuine issue as to any material fact' and that he 'is entitled to judgment as a matter of law.' " *Charbonnages*, 597 F.2d at 414; Fed.R. Civ.P. 56(c). In determining whether this showing has been made, the nonmoving party:

is entitled ... to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted,

all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf; and finally, to be given the benefit of all favorable legal theories invoked by the evidence so considered.

*Charbonnages,* 597 F.2d at 414.

The Supreme Court recently clarified the nonmoving party's burden in *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In *Celotex,* the Court held a nonmoving party must make a showing sufficient to establish each element of her claim in order to defeat a motion for summary judgment. *Celotex,* 106 S.Ct. at 2553. The court stated:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex,* 106 S.Ct. at 2552–53.

The nonmoving party cannot rest on the bald assertions of her pleadings, but must point to specific facts establishing her essential elements:

> Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial."

*Celotex,* 106 S.Ct. at 2553. *See also Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985).

Here, the defendants have relied principally on the affidavit of Larry D. Price, a former Penn Life employee. To a large extent defendants have failed to support their opposition with specific facts by making reference to depositions, interrogatory answers or requests for admissions.[1]

## III. FACTS AND LAW COMMON TO EACH OF THE FIVE CASES

As the facts vary in each of the five individual cases, Penn Life's Motion for Summary Judgment confronts this court with five separate motions for summary judgment. However, each case contains similar allegations and issues of law which must be decided by the court. The court will address these common issues together.

### A. The Insurance Policy

This action centers around the "Total Confinement Benefits for Life" provision in each of the counter-plaintiffs' insurance policies. This provision reads in full:

PART THREE

TOTAL CONFINEMENT BENEFITS FOR LIFE

If "Such Injury" as described in the Insuring Clause and not hereinafter excepted shall within thirty days after the date of the accident continously disable and prevent the Insured from performing any and every duty pertaining to any business or occupation, and as the result thereof is thereby necessarily confined within doors and requires regular and personal attendance by a currently licensed practitioner of the healing arts, other than himself, the Company will pay for any one accident an indemnity for one day or more at the rate shown in the application (1/30th of such Monthly Benefit for each day of any period less than a full month), payments to be made periodically in monthly intervals so long as such total disability and such personal attendance and confinement continues even for life. Confinement shall not be considered terminated · by reason of transportation of the Insured at the direction of his physician to or from a hospital or doctor's office for necessary treatment.

---

1. The Motion for Summary Judgment was continued for approximately one month to allow defendants adequate time to prepare a response.

This benefit is in addition to any other benefit payable under this policy.

(Defendants' Collective Response, Attachments B, C, D, E, and F).

All five of the counter-plaintiffs allege in their Second Amended Counterclaims that Penn Life, through its claims adjuster Anthony Carney, deliberately used an unreasonably restrictive interpretation of the house confinement provision found in the benefits clause to cheat them out of their benefits. Counter-plaintiffs allege that Penn Life, as a member of the International Claim Association, knew similar clauses had received liberal interpretations by judicial construction. Moreover, each counter-plaintiff alleges that Penn Life's own policy manual acknowledges a more liberal definition of house confinement. The five counter-plaintiffs allege that despite this acknowledgement, Penn Life represented to the insureds the following meaning of house confinement:

Confinement is the inability to leave the home except to obtain medical treatment or engage in medically prescribed activities which are primarily therapeutic and not social, recreational or business in nature.

The counter-plaintiffs claim they were fraudulently induced to purchase their insurance policies as Penn Life, at the time of contracting, did not intend to provide benefits as required by the policies, but rather intended to use house confinement to cut off those benefits. This is the fraud in the inducement (insurance policy) claim. Second, counter-plaintiffs claim that Penn Life misrepresented the meaning of house confinement and thereby fraudulently induced them to sign the releases. Third, all counter-plaintiffs allege they were house confined and therefore owed benefits. Finally, all counter-plaintiffs except Johnson allege that Penn Life's actions in handling their claims constituted intentional infliction of emotional distress. The court will now discuss these four claims and the issues of law common to each claimant's case which they bring before the court.

### B. Breach of Contract

All five counter-plaintiffs make the same breach of contract claim against Penn Life. First, each alleges that the release is not valid and enforceable due to fraud. Second, each counter-plaintiff alleges that Penn Life breached its contract and implied covenant of good faith and fair dealing by:

(1) misrepresenting facts regarding the insurance coverage;

(2) failing to acknowledge and act promptly upon communications regarding the insureds' claims;

(3) refusing arbitrarily and unreasonably to pay the insureds' claims;

(4) failing to attempt in good faith to effectuate a prompt, fair and equitable settlement of claims when Penn Life's liability was clear;

(5) attempting to settle the claims for less than the amount a reasonable man would have believed he was entitled;

(6) failing to provide prompt and reasonable explanations for the denial of the claims; and

(7) asserting frivolous and fraudulent defenses to the insureds' claims under the policies.

The counter-plaintiffs' Collective Response to Penn Life's Motion for Summary Judgment does not address these seven specific allegations of breach of contract. (See Defendants' Collective Response, pp. 7–11). The counter-plaintiffs make clear in their response that the gravamen of their claims is that Penn Life failed to pay benefits as required under the policies. As counter-plaintiffs have not presented facts regarding the other various theories of breach, the court need not consider these alleged breaches. Even as self-abbreviated, the breach of contract claims raise issues of law to which the court now turns.

██ In general, to show the initial validity of a release, a party must show that there was some dispute between the parties, that the release was signed and executed settling the dispute, and that consideration was given in return for the release. *See generally* 16 Michie's Jurisprudence,

*Release* (1987). Penn Life has shown that the releases were signed in settlement of insurance disputes for consideration. Counter-plaintiffs have brought forth no facts or arguments disputing this showing. Instead, counter-plaintiffs allege that the releases, even though they were signed and settled disputes for consideration, are invalid and unenforceable on grounds of fraud.

██ A party seeking to avoid a release due to fraud must do so by clear, cogent, and convincing evidence. *Corbett v. Bonney,* 202 Va. 933, 121 S.E.2d 476, 481 (1961); *Nationwide Mut. Ins. Co. v. Muncy,* 217 Va. 916, 234 S.E.2d 70, 72 (1977). Mere heedlessness in signing a release without reading it cannot be invoked to discredit the release and bar its effect. *Corbett,* 121 S.E.2d at 481; *Muncy,* 234 S.E.2d at 74. Moreover, a statement that the release is just a routine formality and is "kind of like a receipt" has been held to be insufficient to bar a release on grounds of fraud. *Corbett,* 121 S.E.2d at 481; *Muncy,* 234 S.E.2d at 74.

██ If counter-plaintiffs can invalidate the releases, they still must prove their underlying breach of contract claims. Material breach of contract occurs when a party fails to do something which it is bound to do according to the contract. *See, e.g., R.G. Pope Constr. Co. v. Guard Rail of Roanoke, Inc.,* 219 Va. 111, 244 S.E.2d 774 (1978). Under Virginia law, every contract contains an implied covenant of good faith and fair dealing in the performance of the agreement. *McMullen v. Entre Computer Center, Inc.,* 819 F.2d 1279 (4th Cir. 1987); *A & E Supply Co. v. Nationwide Mut. Fire Ins. Co.,* 798 F.2d 669, 676 (4th Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 1302, 94 L.Ed.2d 158 (1987). In the insurance context a bad faith refusal to pay benefits, though it does not constitute a tort, may constitute breach of contract. *A & E,* 798 F.2d at 676–78.

However, in the context of this case, there can be no breach of the covenant of good faith and fair dealing if the particular claimant was not house confined. If the claimant was not house confined, then all benefits owed were paid. Similarly, if the claimant was not house confined, no misrepresentations would have been made in obtaining the releases as Penn Life would have made factually correct statements. Also fraudulent intent not to provide benefits would not be possible as all benefits due would have actually been paid. House confinement is therefore an essential element of each counter-plaintiff's breach of contract and fraud claims. Resolution of these claims therefore requires the court to interpret the house confinement clause which is the focus of this lawsuit.

C. The House Confinement Clause

The issue of how to interpret house confinement clauses has been alive in the courts of this country for close to a century. *See* Annotation, *Health Insurance—Confined to House,* 29 A.L.R.2d 1408. The court and the parties have, however, been unable to find a single Virginia Supreme Court opinion discussing how to interpret house confinement clauses under Virginia law. It therefore falls to this federal court to predict how the Virginia Supreme Court would rule on this issue. *See generally Erie R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

The plethora of opinions regarding house confinement clauses from other states confronts this court with a wide array of options. In general, courts have divided into two camps in interpreting such clauses— the so-called "literal" approach and the so-called "liberal" approach.

*The Literal Approach*—Penn Life essentially urges this court to join those courts which have adopted the literal approach to interpreting house confinement clauses. Under the most strict application of the literal approach, a claimant is barred from recovery if he steps out of his residence for any reason, even to visit his doctor. *See* 29 A.L.R.2d 1408, 1413, § 3 "Literal Construction."

In most cases adopting the literal approach, the court is confronted with a policy providing for both non-house confined benefits and for increased benefits when the insured is house confined. The courts reason that the house confining clause

must be given a strict interpretation in order to give full meaning and effect to the clause which provides for non-house confined benefits. *See* 29 A.L.R.2d 1408, 1413, § 3 "Literal Construction."

A good example of such strict construction may be found in *Sheets v. Farmers' & Merchants' Mut. Life & Casualty Ass'n.*, 116 Kan. 356, 225 P. 929 (1924), where the court considered an insurance policy containing both confined and non-confined disability benefits (referred to as "two clause" contracts in the A.L.R. annotation). The court held that under the confined benefits provision, the insured would be barred from recovery if he left his house, even if he merely visited his doctor. The court reached this conclusion because "[t]he language of the policy in question leaves no doubt that a different rate is to be paid when the insured was not confined to his house, but was able to leave his home and travel to the doctor's office." *Sheets*, 225 P. at 931. Similarly, the court stated in *Reeves v. Midland Casualty Co.*, 170 Wis. 370, 174 N.W. 475, 476–77 (1919), "The indemnity provisions of the policy recognize two degrees of illness ... [T]he premium rate was no doubt fixed by the character of the liability assumed and, the company having made use of plain and unambiguous words prescribing the period of full liability, the court should not substitute another and different contract for the parties." *See also* 29 A.L.R.2d 1408, 1413, § 3 "Literal Construction."

Here, the insurance policies contain no provision for non-confined benefits. Penn Life nevertheless argues that the policies in this case must be literally read as they provide substantial benefits to the insured at extremely low costs. To read the house confinement clause liberally, Penn Life argues, would make the coverage equal to that found in higher priced policies, This would increase the coverage beyond that reasonably covered by the low premium, thereby fundamentally altering the deal of the parties.

Penn Life also argues that the clause in this case in essence incorporates the more liberal approach by providing, "Confine-ment shall not be considered terminated by reason of transportation of the insured at the direction of his physician to or from a hospital or doctor's office for necessary treatment." Moreover, Penn Life argues that even states which liberalize house confinement clauses apply them literally when the definition of "confinement" is set forth in the policy itself. For example, in *Walsh v. United Ins. Co.*, 265 N.C. 634, 144 S.E.2d 817, 820–21 (1965), the court distinguished the clause at issue from those given liberal treatment in other cases, stating:

> This case differs from all others in this one material respect: heretofore all courts have placed their own interpretations on the continuous confinement within doors clauses, giving the insured the benefit of the most liberal construction possible. This, however, is the only case insofar as our research has disclosed that the parties have agreed and placed in the contract their interpretation of what the clause means. The parties hereto have agreed that the clause means "confinement of the Insured continuously inside the house because of such sickness, except that the right of the Insured to recover under the policy shall not be defeated because he visits his physician for treatment or goes to the hospital for treatment when such treatment cannot be administered in the *house* of the Insured." (emphasis added) ... The parties having thus agreed, so shall they be bound.

Penn Life argues that the policy here similarly defines house confinement and the parties should be strictly bound by this definition.

Finally, Penn Life asserts that a literal reading of the clause would be in accord with the general rule in Virginia that insurance provisions may only be liberally construed to benefit the insured when they are ambiguous. Penn Life argues that Virginia would follow the case of *Pennsylvania Life Ins. Co. v. Howell*, 346 So.2d 368, 370 (Miss.1977), where the exact provision at issue here was found clear and unambiguous, precluding recovery absent evidence of the insured's "continuous confinement within doors."

*The Liberal Approach*—The vast majority of cases have adopted the liberal approach to interpreting house confinement clauses. While the cases are in general agreement that the clause is not to be literally construed to prevent recovery if the insured merely steps out of doors, they differ in their approach to the clause. The cases are legion, and the court cannot discuss them all. The court will, however, outline the three approaches it feels is reflected in the case law.

*Therapeutic Activity*—The first approach allows the insured to leave her house in very limited circumstances—namely for therapeutic reasons to improve her physical or mental condition. For example, the Arkansas Supreme Court approved the following house confinement jury instruction in *Occidental Life Ins. Co. v. Vervack*, 244 Ark. 1231, 429 S.W.2d 116, 117 (1968):

> [I]f ... Vervack, was advised by a reputable physician or physicians, that it was to the best interest of his health, both mental and physical, and particularly to the best interest of the treatment of the disease from which he suffered, that he take a reasonable amount of exercise, subject himself to fresh air and sunshine, and engage in non-strenuous activities on a limited basis ... this would not preclude finding that he was totally disabled, necessarily and continuously confined within the house....

*See also Massachusetts Protective Assoc. v. Picard*, 76 F.2d 684, 686 (5th Cir.1935), *cert. denied* 296 U.S. 598, 56 S.Ct. 114, 80 L.Ed.2d 424 (1935); *Guarantee Trust Life Ins. Co. v. Koenig*, 240 Ark. 650, 401 S.W.2d 216, 217 (1966); *Williamson v. Nurses' Mut. Protective Corp.*, 142 Fla. 225, 194 So. 643, 645 (1940); *Tyler v. United Ins. Co.*, 243 S.C. 114, 132 S.E.2d 269, 272 (1963); *Guarantee Trust Life Ins. Co. v. Patterson*, 56 Tenn.App. 301, 406 S.W.2d 338, 343 (1966).

*Substantial Confinement*—The second approach looks to the totality of the claimant's activity to determine if she has been substantially confined within doors. A good example of this approach is found in *Penrose v. Commercial Travelers Ins. Co.*, 75 Idaho 524, 275 P.2d 969 (1954). In *Penrose*, the court, after canvassing the various approaches to house confinement provisions, stated that, "such provisions do not mean absolute and indubitable constraint but a practical and intelligent remaining within the house, considering the nature of his illness." *Penrose*, 225 P.2d at 975. The court therefore held that, "there must be *substantial compliance* under the house confinement clause as a condition of recovery and the insured, having met this requirement, if there are no other reasons why recovery should not be had," may recover. *Penrose*, 275 F.2d at 975 [emphasis added]. *See also Manuel v. American Income Life Ins. Co.*, 254 La. 316, 223 So.2d 817, 820 (1969); *West v. Lincoln Income Life Ins. Co.*, 239 So.2d 379, 380 (La.App. 4th Cir.1970).

Similarly, in *United Ins. Co. v. Murray*, 113 Ga.App. 138, 147 S.E.2d 656 (1966), the court looked to the totality of the claimant's activity and held:

> He [the claimant] did his own shopping for groceries and medicine. He visited relatives, and made numerous trips to his attorney's office to discuss this case. He did much of his own driving, including trips to and from Waynesboro, 18 miles from home.... Thus plaintiff's illness and confinement do not come within even the most liberal interpretation of the house confinement clause of his policy.

*Murray*, 147 S.E.2d at 658. *See also Continental Casualty Co. v. Cobb*, 249 Ark. 289, 459 S.W.2d 67, 68 (1970) (Claimant not entitled to house confinement benefits where he drove his auto, attended corporate board meetings and was unrestricted as to when, how and where he went).

Most courts in looking to the totality of the claimant's activity hold that "where an insured is able to and does leave his house for *primarily business or other personal reasons,* he cannot recover benefits under this type of [house confinement] provision." *Price v. United Ins. Co.*, 254 S.C. 301, 175 S.E.2d 221, 223 (1970) [emphasis added]. *See also Crowell v. Federal Life & Casualty Co.*, 61 Mich.App. 377, 232

N.W.2d 710, 716 (Ct. of App.1975), *aff'd,* 397 Mich. 614, 247 N.W.2d 503 (1976); and *Kluge v. Benefit Assoc. of R. Employees,* 276 Minn. 263, 149 N.W.2d 681, 688 (1967).[2]

*Mere Evidence*—Still a third approach holds that confinement is merely a measuring stick against which to judge the insured's disability. Perhaps the clearest example of this approach is found in *Occidental Life Ins. Co. v. Bocock,* 77 Ariz. 51, 266 P.2d 1082, 1087 (1954). In *Bocock* the court stated:

> [T]he provision has reference to the extent and seriousness of the illness rather than to a course of conduct of the assured ... [The clause] has no other purpose than to provide a measuring stick by which it could be determined if the insured was wholly and continuously disabled.

*See also Denley v. Mutual of Omaha,* 251 Or. 333, 445 P.2d 505, 506–07 (1968); *Martin v. Pilot Life Ins. Co.,* 267 S.C. 388, 228 S.E.2d 550, 553 (1976); *Leftwich v. Inter-Ocean Casualty Co.,* 123 W.Va. 577, 17 S.E.2d 209, 212 (1941).

It is this third approach which the counter-plaintiffs urge the court to adopt. Counter-plaintiffs cite to the court *Shealy v. United Ins. Co.,* 239 S.C. 71, 121 S.E.2d 345, 347 (1961), wherein the court stated:

> [It] is our opinion that generally literal compliance with such requirements in an insurance policy is not a pre-requisite to recovery. We think the purpose of the provision relative to the insured's being continuously confined within doors was to describe the character and extent of his illness rather than to prescribe a limitation on his conduct.

*Resolution*—The court does not feel, however, that the Virginia Supreme Court would adopt this particular liberal approach and hold that house confinement is merely evidence of disability. In essence, such an approach would read the house confinement clause entirely out of the contract and would allow for benefits based solely on disability. To give the clause a fair and reasonable interpretation is one thing; to read it out of the agreement entirely goes too far. What is contemplated by this policy is not merely disability benefits, but confinement benefits. This is made quite clear by the title given to the benefits clause at issue: "Total Confinement Benefits for Life." Moreover, the policy states on its face that it is a limited policy. It also provides for lifetime benefits at a very low price.[3] Confinement must, under these circumstances, be given some meaning other than mere evidence of disability. To hold otherwise would fundamentally alter the deal the parties have struck. *See Suits v. Old Equity Life Ins. Co.,* 249 N.C. 383, 106 S.E.2d 579, 582 (1959).

Courts must, of course, be cautious in altering the basic fundamentals of a contract. If such a provision is read entirely out of the contract, insurance companies might raise their premiums and price such policies out of the price range of those poorer persons in society seeking this type of coverage. By fundamentally interfering with the parties' deal, the court risks closing off an entire market. Moreover, parties would contract at their peril, unsure of whether a court might drastically alter their agreement. For these reasons, the house confinement requirement must be given some meaning beyond supplying mere evidence of disability.

The court does not feel, however, that the Virginia Supreme Court would give the clause meaning by adopting the literal approach urged by Penn Life. First, the overwhelming majority of cases have rejected this approach. Second, those cases which have adopted a literal approach have done so when confronted with policies providing for both confined and non-confined benefits in order to give full effect to the distinction between these provisions.

---

**2.** To a certain extent, the therapeutic activity doctrine and the substantial confinement doctrines overlap.

**3.** Mr. Johnson paid $39 a year for his policy (Defendants' Attachment B); Mrs. Bumbrey paid $39 (Defendants' Attachment F); Mrs. Henderson paid $44 (Defendants' Attachment C); Mr. Radford paid $58 (Defendants' Attachment E); and Ms. Skipper paid $67 (Defendants' Attachment D).

Here, the insurance policies do not provide for non-confined benefits and this rationale for strict interpretation is missing.[4]

Penn Life nevertheless argues that a literal interpretation must be adopted to distinguish this low-priced confined benefits policy from other higher-priced non-confined benefits policies available in the market. This concern is well taken. Eliminating the house confinement requirement entirely would destroy the distinction between these two types of policies which are intended to provide different benefits based on different conditions and premiums. However, the court need not adopt the literal approach to house confinement in order to maintain the difference between these two types of policies. As already discussed, the court has rejected the liberal approach which in essence gives no meaning to the house confinement clause. By adopting a liberal approach which still gives the clause meaning, the court *will* differentiate these low-priced confined benefits policies from other more expensive non-confined benefits policies.

This approach has the virtue of differentiating between low-priced confined benefits and high-priced non-confined benefits and not fundamentally altering the parties' agreement. At the same time, it avoids the absurdities involved in literally applying the house confinement clause. For example, an insured well enough to walk around his house, moving up and down the stairs, is entitled to benefits so long as he stays indoors. Should he venture outside to walk a block to mail a letter, however, he would be deprived of his benefits, even though this activity would probably not be more strenuous than walking up and down the stairs in his house. As the vast majority of courts have recognized, such a literal interpretation simply makes no sense. *See* 29 A.L.R. 1408, 1419.

The court also declines to follow Penn Life's argument that because house confinement has already been "defined" in the contract, the court must literally apply this agreed upon definition. This alleged "definition" of house confinement reads, "Confinement shall not be considered terminated by reason of transportation of the Insured at the direction of his physician to or from a hospital or doctor's office for necessary treatment." The court feels it cannot apply this narrowing "definition," as it is not truly a definition. A definition expresses the essential nature of something or states the meaning of a word. This provision does not state the meaning of "house confinement," but rather offers one example of what is meant by house confinement. The clause does not say that this is the only outdoor activity consistent with house confinement and leaves open the possibility that there might be other activities consistent with this requirement. As such, the most that can be said is that the clause is a *partial* explanation of what is house confinement. It stretches the import of the clause to say it is an agreed upon total definition of "house confinement" by which the parties must be strictly bound. To the extent *Walsh v. United Ins. Co.*, 144 S.E.2d 817 (1965), holds otherwise, this court finds that case unpersuasive.

Penn Life's argument that the "definition" incorporates the liberal approach is also unavailing. As the survey of the cases makes clear, even the most stringent liberal approach allows for more outdoor activity than merely visiting one's doctor. Only permitting a claimant to visit his doctor still allows for the absurdities of unreasonably restricting the claimant's outdoor activity. Moreover, to the extent the clause fails to define house confinement, the court may construe the clause against the insurer due to this ambiguity and adopt a liberal definition which allows more activity than merely visiting one's doctor. It is this task of giving a fair and reasonable content to the house confinement requirement to which the court now turns.

The cases adopting the liberal approach make clear that leaving one's home for therapeutic reasons is entirely consistent

---

**4.** Many cases adopting the liberal approach have, in any case, been confronted with two-clause insurance contracts and have still declined to apply them literally. *See* 29 A.L.R.2d 1408, 1415, § 4 (those cases listed under "Liberal Construction" involving "two clauses").

with house confinement. The cases also indicate that if a person leaves her house for business or personal reasons, she is not house confined. The problem arises, however, that those personal reasons for leaving one's house are often the most therapeutic. Visiting friends sounds on the one hand both therapeutic and helpful to recovery and on the other hand like a personal indulgence not necessary for recovery. By the same token, going fishing may seem like an indulgence and yet may be the best therapy for one who loves to fish. Similarly, going to the grocery store is not therapy and yet it is necessary for survival.

What these problems suggest to the court is that pigeon-holing activities, especially so-called personal activities, into permitted and unpermitted categories is not a satisfactory approach. It is clear that therapeutic activities on advice or approval of a doctor must be allowed. It is equally clear that any business activity, such as looking for a job, negates house confinement. What is unclear is the large mass of personal activity in between these two extremes. People, even when they are sick, engage in too many activities for the court to say which ones are consistent with house confinement and which ones are not. Some degree of flexibility is therefore needed.

It is here the court feels the more flexible "substantially confined" test is helpful. This requires a practical and intelligent remaining in the house. Occasional trips outside of the house which are necessary and not significantly more strenuous than strictly therapeutic trips should be allowed. Activity rising above this, however, would not be a practical and intelligent remaining within the house and would show lack of substantial confinement.

 To summarize, the court adopts the following rule:

(1) Those activities engaged in for therapeutic reasons on advice or approval of one's doctor in a bona fide effort to improve one's physical or mental condition are consistent with house confinement.

(2) Any activities engaged in for a business purpose are inconsistent with house confinement.

(3) Those personal activities which fall in between these two extremes will be consistent with house confinement if they show a practical and intelligent remaining in the house such that even though the individual leaves the house on occasion, he is substantially house confined.

The court feels this takes into account the every day realities and necessities of life while striking the proper balance between the absurdities of the literal approach and the dangers in fundamentally altering the parties' agreement embodied in the liberal approach which reads confinement out of the contract. It is this sensible and practical approach, or one very similar to it, which the court feels the Virginia Supreme Court would adopt and which the court will apply in this case.

### D. Fraud (Insurance Policies)

The counter-plaintiffs allege that at the time they purchased their insurance policies, Penn Life had no intention of performing its contractual promise to pay lifetime disability benefits, but rather intended to use house confinement to cut off such benefits. Counter-plaintiffs allege that Penn Life's intention not to perform is evidenced by the way it previously dealt with similar house confinement issues raised by five insureds in Mississippi. In addition, counter-plaintiffs allege that Penn Life manifested its fraudulent intent in dealing with the claims made by each of the Virginia insureds.

 The elements of actual fraud are: (1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled. *Winn v. Aleda Constr. Co.*, 227 Va. 304, 315 S.E.2d 193, 195 (1984).

This particular fraud claim raises the issue of whether Virginia recognizes liability for fraud for entering into a contract with a present, subjective intention not to perform. The Supreme Court of Virginia re-

cently addressed this issue in *Colonial Ford Truck Sales, Inc. v. Schneider*, 228 Va. 671, 325 S.E.2d 91, 94 (1985), and stated:

While failure to perform an antecedent promise may constitute breach of contract, the breach does not amount to fraud. But the promisor's intention—his state of mind—is a matter of fact. When he makes the promise, intending not to perform, his promise is a misrepresentation of *present* fact, and if made to induce the promisee to act to his detriment, is actionable as an actual fraud. *Lloyd v. Smith*, 150 Va. 132, 145–47, 142 S.E. 363, 365–66 (1928); *accord Sea-Land Service, Inc. v. O'Neal*, 224 Va. 343, 351, 297 S.E.2d 647, 651–52 (1982).

However, it is axiomatic that where the party actually performs his obligations under the contract, liability for fraud cannot possibly exist on this theory. To the extent that a counter-plaintiff cannot show he or she is owed more benefits, then the counter-plaintiff cannot establish this fraud claim.

### E. Fraud (Release)

Counter-plaintiffs allege that they were fraudulently induced to sign the releases both as an affirmative claim and as a defense to the releases. With slight variations, counter-plaintiffs allege that Penn Life:

(1) misrepresented that the insureds were no longer house confined;

(2) misrepresented the amount of additional benefits the insureds were due;

(3) misrepresented the defenses which were available to Penn Life on the various claims;

(4) misrepresented that Penn Life had not received physician reports when in fact it had; and

(5) concealed Penn Life's internal definition of house confinement.

Again, while counter-plaintiffs allege these specific misrepresentations, their response to Penn Life's Motion for Summary

Judgment only presents facts regarding Penn Life's alleged misrepresentation that the claimants were not house confined. (*See* Defendants' Collective Response, pp. 19–22).[5] The court therefore only need consider the alleged misrepresentation, "You are not house confined," in ruling on this motion.

■ Penn Life argues that this statement is a mere expression of opinion not actionable as fraud. Under Virginia law, in order for a statement to amount to fraud, it must be a positive statement of fact and not a mere expression of opinion. *Barnes v. Barnes*, 207 Va. 114, 148 S.E.2d 789, 795 (1966). A matter "susceptible of exact knowledge when the statement is made, is usually considered as a matter of fact." *Poe v. Voss*, 196 Va. 821, 86 S.E.2d 47, 49 (1955).

Generally, statements regarding legal conclusions have been held to be mere expressions of opinion. In *Barnes*, the court held the statement that it was " 'somewhat doubtful' that Clarence Asa Barnes 'could claim a share in the money that Mrs. Barnes received from the sale of the farm at her death if anything is left' " was a mere "expression of opinion as to the correct interpretation of the will [at issue]." *Barnes*, 148 S.E.2d at 795. Similarly, in *Piedmont Trust Bank v. Aetna Casualty & Surety Co.*, 210 Va. 396, 171 S.E.2d 264, 267 (1969), the court held that statements regarding the validity of an "other insurance" provision were mere expressions of opinion as no court in Virginia had ruled on the issue. The court stated:

Until such time as this court spoke, the validity of the "other insurance" provision was not a matter susceptible of exact knowledge or interpretation and could only be the subject of an opinion.

*Piedmont*, 171 S.E.2d at 267.

Given the uncertainty regarding how Virginia would interpret a house confinement clause, Penn Life has a strong argument that the statement, "You are not house

5. Bumbrey does present another allegation of fraud, which is discussed at p. 1206, n. 9 of this

opinion.

confined" is in no way susceptible of exact knowledge and is therefore a matter of opinion. However, *Poe v. Voss* makes clear that:

> It is not always easy to determine whether a statement is one of opinion or one of fact. In deciding the question, the subject matter, the form of the statement, the attendant circumstances, and the knowledge of the parties must be considered.

*Poe*, 86 S.E.2d at 49.

■ As to subject matter, it is not clear that the statement at issue is a reference to the state of the law—it does not necessarily indicate "under Virginia law, you are not house confined." Instead, it could just as easily be taken to mean, "the evidence in your file from your doctor shows you are not house confined." This matter would be more susceptible of precise determination and hence more factual. The form of the statement "you are not house confined" is also very unequivocal and certain. In contrast, the statement in *Barnes* was phrased in terms of "somewhat doubtful." This is far afield from the allegations in this case that an intimidating insurance adjuster arrived at the claimant's house and pronounced unequivocally that they were owed no benefits. Finally, as to the relative knowledge of the parties, Carney was an experienced claims adjuster. The five claimants are, for the most part, poorly educated people unfamiliar with the subtleties of insurance policies and law. In light of these attendant circumstances, the court is reluctant to hold the statement at issue an unactionable opinion. While in the abstract, "you are not house confined" might sound at first blush like an opinion regarding the application of a set of facts to uncertain law, under the realities and circumstances of this case, the court believes the jury could find this statement to be one of fact. The court will therefore deny Penn Life's Motion for Summary Judgment on this ground.

### F. Fraud—Statute of Limitations

■ Since *Pigott v. Moran*, 231 Va. 76, 341 S.E.2d 179, (1986), it is clear that claims for fraud are subject to a one-year statute of limitations. While the one-year period is simple and direct, the issue of when a claim for fraud accrues is more difficult. Fraud is, in essence, a sleeping tort. Often the very fraud which is alleged serves as its own cover, lulling the plaintiff into a mistaken sense of propriety. It is therefore only when the fraudulent misrepresentation is discovered or by exercise of due diligence should have been reasonably discovered that the statute begins to run. Va.Code § 8.01–249(1); *Lavay Corp. v. Dominion Federal Sav. & Loan Ass'n.*, 645 F.Supp. 612, 615 (E.D.Va.1986).

Issues of when a fraud should reasonably have been discovered, as with most issues of reasonableness, are typically best left to the jury. *Schmidt v. McKay*, 555 F.2d 30, 37 (2d Cir.1977). Especially here, where it would be inherently difficult for a layperson to investigate the difficult problem of house confinement, questions of due diligence in discovering the alleged frauds must be left to the jury. Clear evidence of actual knowledge of fraud one year before the filing of suit will, however, lead this court to grant summary judgment.[6]

### G. Intentional Infliction of Emotional Distress

All the defendants except Johnson have claimed intentional infliction of emotional distress. The Virginia Supreme Court has held that a cause of action lies for emotional distress provided four elements are shown:

> One, the wrongdoer's conduct was intentional or reckless.... Two, the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality.... Three, there was a causal connection between the wrongdoer's conduct and the

---

**6.** Counter-plaintiffs *allege* fraudulent concealment in that Carney told the insureds they could not sue once they signed the release. This would provide grounds for fraudulent conceal-

ment. However, there is absolutely no indication in the documentary materials before the court that Carney said this.

emotional distress. Four, the emotional distress was severe. *Womack v. Eldridge*, 215 Va. 338, 210 S.E.2d 145, 148 (1974). The court, in the first instance, should determine if the defendants' conduct may be regarded as so extreme and outrageous as to permit recovery. *Womack*, 210 S.E.2d at 148; *Woodring v. Board of Grand Trustees of Benev. & Protective Order of Elks*, 633 F.Supp. 583, 592 (W.D.Va.1986).

In *Cluff v. Farmers Ins. Exchange*, 10 Ariz.App. 560, 460 P.2d 666, 668 (1969), the court held that an insurance adjuster's actions in threatening and cajoling a claimant to accept a settlement did not constitute conduct which was "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a cultured society." In doing so, the court noted that "conduct even in our 'civilized' community has amply shown that self seeking and inconsideration are a common trait in man's relationship with man." *Cluff*, 460 P.2d at 669. The court further distinguished the case before it from *Interstate Life & Acci. Co. v. Brewer*, 56 Ga.App. 599, 193 S.E. 458 (1937), where an insurance adjuster's conduct in throwing a handful of coins in plaintiff's face and shouting "you don't need a doctor, you ought to die" was held to be extreme and outrageous. *Cluff*, 460 P.2d at 669.

In *Reamsnyder v. Jaskolski*, 10 Ohio St.3d 150, 462 N.E.2d 392 (1984), an insurance agent called the claimant on the phone several times regarding settlement of his claim. The agent was alleged to have pressured the claimant so vigorously that the claimant had a nosebleed and headache which forced him to see a doctor. In a second incident, an employee of Agency Rent-A-Car told the plaintiff, who had failed to return his rental car, that he had reported the car as stolen. The employee also told plaintiff that he was going to tear his face off unless he returned the automobile. Plaintiff became so upset that he had to be taken to the hospital. The court held

the insurance agent's pressure to settle the claim was not sufficiently extreme and outrageous, but the employee's threat to tear off the plaintiff's face did state a claim for emotional distress. *Reamsnyder*, 462 N.E.2d at 394–95.

Finally, in *Luster v. Columbia Mut. Ins. Co.*, 624 S.W.2d 890 (Mo.App.1981), the plaintiff's minor daughter was killed in an auto accident. During the parent's period of mourning, the insurance adjuster persistently contacted the parents in an effort to settle their claim before they had a chance to obtain legal counsel. The court held:

> We think that while the well pleaded facts in the petition before us demonstrated a callous indifference by adjuster Stevens of the bereaved plaintiffs in the darkest of hours, we are of the opinion that such activities fall into the category of inconsiderate and unkind indignities but do not measure up to the extreme and outrageous conduct which the law recognizes to be actionable.

*Luster*, 624 S.W.2d at 893. *But see Morgan v. American Fam. Life Assoc. Co. of Columbus*, 559 F.Supp. 477, 482 (W.D.Va. 1983) (court finds "with some concern" that bad faith failure to pay benefits may be extreme and outrageous enough to survive motion to dismiss);[7] and *Fletcher v. Western Nat. Life Ins. Co.*, 10 Cal.App.3d 376, 89 Cal.Rptr. 78 (Ct. of App. 4th Dist. 1970).

Here, counter-plaintiffs have brought forth facts tending to show that Penn Life uses the house confinement clause in a fraudulent manner as part of an on-going scheme to cheat insureds out of their benefits. (*See* Price Affidavit). Counter-plaintiffs also argue that Penn Life's actions were outrageous and extreme as the claimants were injured and out of work and Radford's house was facing foreclosure. (Defendants' Collective Response, pp. 24–26).

■■■■ The court feels, however, that it has no choice but to grant Penn Life's

---

**7.** This court has similarly held that the counter-plaintiffs stated a claim for emotional distress. At this stage of the proceedings, with more developed facts, the court cannot say, however, that the intentional infliction claim should be submitted to the jury.

Motion for Summary Judgment. First, the mere fact that fraud allegations are made does not necessarily satisfy the extreme and outrageous requirement. *See Woodring*, 633 F.Supp. at 593. In *Woodring* the court stated in considering defendants' motion for summary judgment, "[c]onsidering first Woodring's allegation that the facts underlying his fraud claims support a claim under *Womack*, the court believes this claim groundless. The defendants' conduct could hardly be considered extreme and outrageous." *Woodring*, 633 F.Supp. at 593.

While the court is sympathetic to the plight of people injured in accidents, or those facing foreclosure, the extreme and outrageous requirement is a difficult one to meet, as the cases outlined above illustrate. Here, the court is not confronted by an adjuster who threw coins in a claimant's face, told her she deserved to die, or threatened to tear her face off. Moreover, the plight of injured individuals or those facing foreclosure, is certainly not worse than that of grieving parents mourning the loss of a child. The court does not feel that a jury could find Penn Life's actions were so extreme and outrageous under the circumstances of this case as to constitute intentional infliction of emotional distress.

Moreover, counter-plaintiffs have failed to produce any evidence regarding emotional distress, much less that such distress was severe, or that it was caused by Penn Life. The counter-plaintiffs argue that they were not required to do so, stating:

> None of the defendants were asked questions in their depositions about any emotional distress or how they felt when their benefits were terminated. Thus, no factual issues are presented as to elements 3 and 4. If no facts are put into controversy, then there is no corresponding duty to respond in a summary judgment motion. *Catrett v. Johns-Mansville Sales Corp.*, 756 F.2d 181 (D.C.Cir. 1985).

(Defendants' Collective Response, p. 24).

This misconstrues the moving party's burden on a summary judgment motion as one of producing facts. In *Celotex* the

Supreme Court made clear that "the burden of the moving party may be discharged by 'showing'—that is, pointing out to the District Court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 106 S.Ct. at 2554. This is precisely what Penn Life did as to the severe emotional distress element when it stated, "Nothing in the record, beyond the allegations in defendants' amended counterclaims that simply parrot the elements of the tort defined in *Womack*, suggests remotely that Bumbrey or any of the other defendants has suffered 'severe' emotional distress." (Plaintiff's Bumbrey Brief, p. 17, n. 21). Having pointed out the absence of facts to support the nonmoving party's case, Penn Life has met its burden. It need not, as counter-plaintiffs mistakenly argue, produce facts "negating the opponent's claim." *Celotex* 106 S.Ct. at 2553. Penn Life having pointed out the absence of facts, it became incumbent upon counter-plaintiffs to point to specific facts showing the essential element of severe emotional distress. This they have utterly failed to do and indeed have not attempted to do. This provides another reason to dismiss the emotional distress claims irrespective of whether a jury could find the acts complained of extreme and outrageous.

For these reasons, summary judgment is granted on all claims of intentional infliction of emotional distress.

## IV. INDIVIDUAL CLAIMS

The court now turns to separate consideration of the claims brought by each of the five counter-plaintiffs.

### A. Harmon F. Johnson

Mr. Harmon F. Johnson's claim is somewhat different from the others as he was represented by an attorney when he signed the release. Johnson was seriously injured in a cement truck accident on November 4, 1980. Penn Life paid benefits to Johnson up until July, 1983, when Johnson agreed to undergo an independent medical exam. (Johnson Dep., pp. 168–69). In early November, 1983, the independent medical exam was performed by a Dr. Nevin. On

January 16, 1984, Carney told Johnson, through his attorney, that Johnson could not receive further benefits because Dr. Nevin expressed an opinion that Johnson was not house confined. On the advice of his attorney, Johnson accepted a proposed settlement of $2,760 and signed the release and policy surrender on January 25, 1984. Prior to signing the release, Johnson had received $15,650 in benefits. (Johnson Dep., p. 169).

Virtually all communications from Penn Life regarding Johnson's claim were made to Johnson's attorney, on whose advice Johnson relied when signing the release. (Johnson Dep., pp. 37–39). Under Virginia law, a party cannot maintain a claim for fraud, even if misrepresentations are shown, where the party "conducted their own independent investigation by seeking and obtaining the opinion of an outside expert." *Piedmont,* 171 S.E.2d at 267. In *Piedmont,* the court reasoned that where reliance was placed on the opinion of one's own expert, "the element of reliance [on the misrepresentation], an essential element of fraud, was absent and, in those circumstances, there could be no fraud." *Piedmont,* 171 S.E.2d at 267. *See also Poe,* 86 S.E.2d at 49; *Harris v. Dunham,* 203 Va. 760, 127 S.E.2d 65, 71 (1962); *De Jarnette v. Thomas M. Brooks Lumber Co.,* 199 Va. 18, 97 S.E.2d 750, 758 (1957). In the context of settlements of legal disputes reached on the advice of an attorney, this rule has the virtue of making attacks on settlements more difficult, thereby promoting the principle of finality.

■ Here, Johnson made his own investigation of whether he was entitled to more benefits by seeking the opinion of an outside expert, his attorney. The evidence is uncontroverted that he relied on his attorney's advice that he was owed no more benefits and should accept the settlement. Johnson testified at his deposition that in signing the release he "relied on basis of my attorney. He told me that is all he could do.... He told me that he talked them into giving me a little bit more than they was supposed to and I was no longer house-confined." (Johnson Dep., p. 170). Johnson therefore cannot possibly show by clear and convincing evidence the critical element of reliance on the misrepresentations of Penn Life. His affirmative claim that he was fraudulently induced to sign the release and his defense to the release are therefore fatally defective. As the release is valid, all claims must be dismissed. Having once put an end to his case on the advice of his attorney, Johnson's attempt to breath new life into his claim must fail.

Moreover, evidence of Johnson's house confinement has not been presented to the court. The totality of Johnson's submission on this critical issue reads: "No serious question exists about H. Johnson's 'total disability.' Johnson also satisfied Penn Life's obsolete 'house-confinement' term." (Defendants' Collective Response, p. 8). This bare conclusion in no way puts specific facts in issue as to this essential element of all Johnson's claims.[8] This alone warrants summary judgment. *Celotex,* 106 S.Ct. at 2553.

■ Moreover, Johnson's deposition shows he went outside, drove his car, visited friends, went shopping, went to the movies, and left the town he lived in for trips. (Johnson Dep., p. 47). Given these facts, the court does not feel any jury could find Johnson was substantially house-confined.

---

**8.** The court declines to take into consideration Price's affidavit testimony that the claimants were house confined. First, his testimony is a mere conclusion, unsupported by reference to facts. Second, this is not a conclusion for a witness to draw, but one for the court on summary judgment and the jury at trial. The court has ample facts before it regarding the extent of the counter-plaintiffs' house confinement and must draw its own conclusions based on these facts. Third, Price's conclusion as to house confinement may be based on a different definition of "house confinement" than that adopted by the court. Thus, while Price's affidavit goes strongly to intent to defraud, the court will not consider it in deciding whether these counter-plaintiffs were house confined. Even if Penn Life had a scheme to defraud claimants by misrepresenting their house confinement, if a particular claimant was not house confined, the fraud would not be actionable as Penn Life would not have misrepresented a material fact, an essential element of any fraud claim. *See Winn,* 315 S.E.2d at 194.

For the foregoing reasons, all of Johnson's claims must be dismissed.

### B. Gladys Bumbrey

Gladys Bumbrey was a school bus driver who sustained injuries as a result of being assaulted by an irate parent in February, 1983. She returned to work in April, 1983, as a school custodian. In November, 1984, Bumbrey sustained a back injury while lifting a bucket. She was hospitalized for approximately 10 days. Bumbrey was insured by Penn Life's Automobile Accident and Insurance Policy and two riders covering confining total disability resulting from other types of accidents. The riders provided benefits of $400 a month up to a maximum of six months. In March, 1985, Bumbrey filed a claim with Penn Life for benefits on account of her November, 1984, accident.

■ As to Mrs. Bumbrey's fraud claims, the court finds that both fraud claims are barred by Virginia's one year statute of limitations. In her deposition, Mrs. Bumbrey testified that she dropped her policies when she found out she had been cheated in 1985. (Bumbrey Dep., p. 169). Assuming the latest possible date in 1985, Mrs. Bumbrey knew she had been fraudulently cheated by Penn Life by December 31, 1985. This suit began on January 7, 1987. Both of Mrs. Bumbrey's fraud claims are therefore barred by the one year statute of limitations.[9]

Moreover, Mrs. Bumbrey has failed to point out any facts showing she was house confined. While the counter-plaintiffs' brief does make reference to Mrs. Bumbrey's disability, absolutely no reference is made to house confinement. (*See* Defendants' Collective Response, pp. 10, 14, 22–23). Bumbrey has therefore not met her burden under *Celotex* of setting forth specific facts showing her house confinement.

■ In addition, Bumbrey's own physician reported to Penn Life that by December, 1984, Bumbrey was able to return to work with restrictions against heavy lifting. (Plaintiff's Attachment C, Exhibit 16). Bumbrey's physician never advised her to remain at home. (Bumbrey Dep., pp. 74–75, 80–81, 163). Bumbrey admits she took walks, rode with her sister, and would go shopping in the mall. (Bumbrey Dep., p. 129). The court is therefore confronted with no evidence of confinement and very strong evidence that Mrs. Bumbrey was not house confined. There is therefore no issue for the jury on the critical issue of house confinement. With no facts showing house confinement, Mrs. Bumbrey cannot show she was owed further benefits or that Penn Life never intended to pay her such benefits.

For these reasons, summary judgment must be granted on all of Mrs. Bumbrey's claims.

### C. Nathaniel J. Radford, Jr.

Nathaniel J. Radford, Jr. was injured in a tractor-trailer accident in January, 1983. Radford was paid benefits through May, 1983. On July 29, 1985, Radford alleges Carney visited him at his house to discuss his claim. At that time, Radford alleges Carney told him he was not house confined and could no longer receive benefits. Radford and Carney then argued over the meaning of house confinement. Radford showed Carney a publication summarizing a Court decision that had interpreted house confinement and told Carney that he was house confined. Carney left without discussing settlement. In a subsequent telephone call, Penn Life offered Radford $6,000 to end his claim, and Radford ac-

---

**9.** The court notes that Mrs. Bumbrey has brought forth facts regarding an alleged misrepresentation other than house confinement—namely, that she was told she was merely signing a receipt for *hospital* confinement benefits when she signed the release. (Bumbrey Dep., pp. 150–51, 196). This could constitute a misrepresentation. The case at bar is distinguishable from *Corbett v. Bonney*, 202 Va. 933, 121 S.E.2d 476 (1961) and *Nationwide Mutual Ins. Co. v. Muncy*, 217 Va. 916, 234 S.E.2d 70 (1977). In both of those cases, the insureds knew they were agreeing to a settlement, and the court merely held statements that the release form was "only like a receipt" were not actionable misrepresentations. Here, Mrs. Bumbrey has testified she was told she was signing a receipt for hospital benefits and therefore the whole nature of the agreement, not merely the nature of the form, was misrepresented.

cepted. The date was August 8, 1985. Carney mailed Radford the release and he signed it, adding a handwritten note that he was only doing so to prevent foreclosure on his house. Penn Life then sent Radford another release form telling him to sign it and add nothing to it. Radford did so, but received his money too late to avoid foreclosure.

██ The court finds that both of Radford's fraud claims are barred by the statute of limitations. First, as to the fraud (insurance policy) claim, the uncontroverted evidence shows Radford filed a complaint with the State Corporation Commission, Insurance Bureau on February 22, 1985, complaining that Penn Life was not paying him the disability benefits he was due. (Plaintiff's Attachment C, Exhibit 18). He therefore knew that Penn Life had no intent to pay him benefits in accordance with the insurance policy on this date. Therefore, the one-year statute of limitations would bar Radford's claim that at the time the insurance contract was purchased Penn Life had no intent to provide benefits.

As to the fraud (release) claim, Mr. Radford agreed to the release over the telephone on August 8, 1985. (Carney Affidavit, p. 5; Radford Dep., p. 175). Before agreeing to the release, Radford disputed the definition of house confinement with Carney on July 29, 1985, when Carney visited him at his home. At that time Radford showed Carney a page out of the Family Legal Advisor disputing Penn Life's definition of house confinement. (Radford Dep., p. 173). Moreover, Radford stated in his deposition that when he agreed to the release on August 8 he told Penn Life "something to the extent, you know, it is not acceptable to me, you know, because I *know* you owe me more than that." (Radford Dep., p. 236) [emphasis added].

██ It is therefore clear from these uncontroverted facts that on July 29, 1985, Radford felt that Penn Life was misusing the definition of house confinement. The evidence is further uncontroverted that Radford knew on August 8, when he agreed to the release, that he was owed more benefits than he was getting. Giving Radford the benefit of the doubt, his claim accrued at the latest on August 8, 1985, when he reluctantly agreed to the release even though he knew he was owed more benefits. Radford filed a claim in state court on August 13, 1986, which was removed to this court and consolidated with this case. Mr. Radford's fraud (release) claim is therefore untimely. Summary Judgment is therefore granted as to both of Radford's fraud claims as they are barred by Virginia's one year statute of limitations.

██ While Radford's affirmative fraud claims are barred by the statute of limitations, the court finds that Radford has brought forth sufficient facts regarding fraud and duress in the signing of the release. As to duress, Radford stated in deposition testimony that he did not want to sign the release, but felt he had to since he had no other choice. (Radford Dep., pp. 175, 236). When Radford signed the first release he added a note stating he did so only to avoid foreclosure. On August 19, Radford signed a notarized statement that he agreed to the release under duress. (Defendants' Attachment O, Dep. Exhibit 37). Regarding fraud (as discussed below) Radford has brought forward facts showing he was house confined through October, 1984. His house confinement therefore may have been misrepresented by the claims adjuster Carney. Duress and fraud as defenses to the release should therefore proceed to the jury.

██ As to the merits of the breach of contract claim, Radford has specifically brought forth the fact that Doctors Webster and Noel opined that Radford's house confinement existed from January, 1983, to October of 1984. (Defendants' Attachment O, Dep. Exhibits 37 & 38). However, absolutely no evidence has been presented regarding house confinement after October 1984. (*See* Defendants' Collective Response, pp. 9, 13, 21). Moreover, Radford testified in his deposition that he began work as a security guard with Abatis Security in the fall of 1984. (Radford Dep., pp. 8–12). Holding a job would, of course, be entirely inconsistent with house confine-

ment. Radford will therefore only be allowed to present evidence at trial that he was owed benefits through October, 1984.

Penn Life's Motion for Summary Judgment is therefore denied on Radford's breach of contract claim as to benefits through October, 1984, but granted as to benefits after October, 1984, and granted as to Radford's fraud claims.

### D. Emma L. Henderson

Emma Henderson was involved in three automobile accidents. The first accident occurred in May, 1983, and caused her to be house confined until September 16, 1983. On September 18, 1983, she was involved in a second automobile accident, and her physician reported this accident left her confined through November 5, 1983. She was paid house confined benefits through November 19, 1983, based on her physician's report.

On November 18, 1983, Henderson was involved in yet a third automobile accident. She did not make a claim for benefits as a result of this accident until August, 1984. The accompanying physician's report indicated her prior injuries had been aggravated. Penn Life tried to secure additional medical information, but her physician apparently had trouble filling out the required claim forms. On September 3, 1985, Henderson executed a release settling her claim for $1,000.

Henderson has pointed to specific facts regarding the critical issue of house confinement up to August 10, 1984. First, Henderson testified in deposition that she was confined to her house as of August 10, 1984. (Henderson Dep., pp. 65–70; Defendants' Attachment K, Dep. Exhibit 10). Second, Dr. Hladys opined as of August 1, 1984, that Mrs. Henderson was disabled and marked the box "yes" for house confinement. (Defendants' Attachment K, Dep. Exhibit 11).

Penn Life's submission on the extent of Mrs. Henderson's house confinement only points to the fact that Mrs. Henderson conceded that she left her house to go to church (Henderson Dep., p. 62). Her doctor, however, specifically advised her to go to church. (Henderson Dep., p. 18). It is therefore apparent that Mrs. Henderson went to church for therapeutic reasons because of her deeply held religious beliefs and her doctor's advice. (Henderson Dep., p. 62). Such activity would be consistent with house confinement. Mrs. Henderson further testified that she never left her house to shop, but rather had other members of her family buy their groceries. (Henderson Dep., p. 62). Because Mrs. Henderson has pointed to specific facts showing house confinement up to August 10, 1984, facts are in dispute as to whether Mrs. Henderson was substantially confined up to August 10, 1984. Mrs. Henderson has failed, however, to produce any facts regarding house confinement after that date. (*See* Defendants' Collective Response, pp. 10, 15, 22).

Because Henderson may have been house confined up to August 10, 1984, Carney may have misrepresented her house confinement when he obtained the release. This fact may certainly be a material one upon which Mrs. Henderson relied. The Price affidavit provides evidence of an intent on Penn Life's part to misrepresent house confinement to obtain releases. Mrs. Henderson therefore may be able to avoid the release due to fraud. Summary judgment is therefore granted on Henderson's contract claim as to benefits after August 10, 1984, but denied as to benefits before that date.

To the extent Henderson can show fraud as a defense to the release she may be able to establish her affirmative claim of fraud in signing the release. To the extent Mrs. Henderson can show that Penn Life failed to pay her benefits up to August 10, 1984, she may also be able to show Penn Life never intended to pay her all the benefits she was owed. Fraud in the purchase of the insurance policy may therefore be shown. As the court further feels the issue of due diligence in discovering these frauds is best left to the jury and there is no evidence that Henderson knew she had been defrauded one year before filing suit, the statute of limitations issue must also go to trial.

For these reasons, summary judgment is denied as to both of Henderson's fraud claims, denied as to breach of contract benefits up to August 10, 1984, but granted as to benefits after that date.

### E. Ossie L. Skipper

Ossie L. Skipper, who is Mrs. Henderson's daughter, was insured with Penn Life on November 1, 1979. Skipper filed a claim in December, 1983, seeking benefits for injuries she received in her mother's May, 1983, accident. She used the same doctor as her mother, and Penn Life apparently had similar difficulty in getting medical information from him. Skipper was paid $2,334.50 in benefits, including three months of house confining disability benefits. On October 31, 1984, Ms. Skipper signed the release in exchange for $920.

Again, Skipper's Response to the Motion for Summary Judgment only addresses disability and utterly fails to point to any facts regarding the critical issue of her house confinement. (*See* Defendants' Collective Response, pp. 11, 14–15, 22). Summary judgment is therefore required under *Celotex.*

■ Moreover, Skipper's own physician reported on December 17, 1983, that Skipper was no longer house confined as of November 17, 1983. (Plaintiff's Attachment D, Dep. Exhibit 2). In the period immediately after the accident, Skipper's physician did not advise her to remain at home. (Skipper Dep., p. 44). Rather, he only gave her restrictions on lifting and bending. Skipper also testified that she left her house to go grocery shopping, to look for work, and to visit her mother. (Skipper Dep., pp. 45–46). Although Skipper's response fails to point ths out, Dr. Hladys's report of April 6, 1984, certified Skipper as house confined from April 13 to April 23, 1984. (Plaintiff's Attachment D, Dep. Exhibit 7). Similarly, in Skipper's own report of April 24, 1984, she checked off the box for house confinement. (Plaintiff's Attachment D, Dep. Exhibit 8). However, Skipper herself testified that at this time she was leaving her house to look for employment. (Skipper Dep., pp. 93–95).

Indeed, in the April 24 report, Skipper acknowledged that she was leaving her house to look for a job. (Plaintiff's Attachment D, Dep. Exhibit 7). This is clearly a business purpose inconsistent with house confinement. Skipper has therefore failed to advance any facts showing house confinement, and no jury could find for her on this critical issue.

Because Skipper fails to create any issue as to her house confinement, no jury could conclude by clear and convincing evidence that Carney misrepresented her house confinement in obtaining the release. Her fraud (release) claim must therefore be dismissed. The release is therefore valid and bars Skipper's claims. Moreover, because Skipper was not house confined, she was paid all benefits she was owed and no breach of contract occurred. Finally, because Penn Life performed its obligations under the contract, Skipper cannot show by clear and convincing evidence that Penn Life never intended to pay the benefits owed under the contract.

For these reasons, summary judgment is granted as to all of Skipper's claims.

An appropriate Order shall issue.

### ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is accordingly ORDERED that:

(1) Penn Life's Motion for Summary Judgment is GRANTED as to defendant/counter-plaintiff Harmon F. Johnson. Judgment is ENTERED in favor of Penn Life on its action for declaratory judgment, and all of Johnson's counterclaims are DISMISSED with prejudice.

(2) Penn Life's Motion for Summary Judgment is GRANTED as to defendant/counter-plaintiff Gladys E. Bumbrey. Judgment is ENTERED in favor of Penn Life on its action for declaratory judgment, and all of Bumbrey's counterclaims are DISMISSED with prejudice.

(3) Penn Life's Motion for Summary Judgment is GRANTED as to defendant/counter-plaintiff Ossie L. Skipper. Judgment is ENTERED in favor of Penn

Life on its action for declaratory judgment, and all of Skipper's counterclaims are DISMISSED with prejudice.

(4) Penn Life's Motion for Summary Judgment is DENIED in part and GRANTED in part as to defendant/counter-plaintiff Nathaniel J. Radford. Summary Judgment is DENIED as to Penn Life's action for declaratory judgment and as to Radford's counterclaim for breach of contract in so far as it seeks damages prior to the end of October, 1984. Summary Judgment is GRANTED as to Radford's counterclaims for fraud (insurance policy), fraud (release), intentional infliction of emotional distress, and breach of contract in so far as it seeks damages after October, 1984.

(5) Penn Life's Motion for Summary Judgment is DENIED in part and GRANTED in part as to defendant/counter-plaintiff Emma L. Henderson. Summary Judgment is DENIED as to Penn Life's action for declaratory judgment, and as to Henderson's counterclaims for fraud (insurance policy), fraud (release), and breach of contract in so far as it seeks damages prior to August 10, 1984. Summary Judgment is GRANTED as to Henderson's counterclaims for intentional infliction of emotional distress and breach of contract in so far as it seeks damages after August 10, 1984.